DETERMINED IN THE

# Supreme Court of Judicature,

OF THE

# STATE OF NEW JERSEY,

AT NOVEMBER TERM, 1821.

ROBERT ARNOLD *against* BENAJAH MUNDY.

IN TRESPASS.

1. Navigable rivers, where the tide ebbs and flows, the ports, bays, coasts of the sea, including both the waters and the land under the waters, for the purposes of passing and repassing, navigation, fishing, fowling, sustenance, and all other uses of the water and its products, are common to all the people of New Jersey.

2. By the grant of Charles II. to the Duke of York, those royalties, of which the rivers, ports, bays, and coasts were a part, passed to the Duke of York, as the governor of the province exercising the royal authority, and not as the proprietor of the soil, and for his own use.

3. Upon the Revolution, all those royal rights vested in the people of New Jersey, as the sovereign of the country, and are now in their hands.

4. The proprietors of New Jersey did not, under the grant from the Duke of York, take such a property in the soil of the navigable rivers in this state, that they could grant several fisheries therein.

5. A person who plants oysters on the bed of a navigable river, below low water mark, has not such a property therein as to enable him to maintain trespass against a person taking them away, although the oyster bed should be adjacent to his own shore.

6. A grant of land bounded upon a fresh water stream or river, where the tide neither ebbs nor flows, extends *ad filum aquæ;* but a grant bounded upon a navigable river extends to the edge of the water only.

This was an action of trespass for breaking the close of the plaintiff, situated in Perth Amboy, and taking his oysters, &c. The cause came on to be tried at the Middlesex Circuit, before his honor the Chief Justice and a special jury, at the December sessions, 1819. On the trial, the plaintiff deduced title to the oystery—

1. Under surveys to Peter Sonmans, dated 28th March, 1689–90, and 20th January, 1685, to the river opposite to the oystery, and deduced title down to himself.

2. Under a survey, dated 8th April, 1818, for the land where the oysters were planted; and showed a number of grants of fisheries and beds of navigable rivers by the proprietors, both before and after the surrender.

The plaintiff proved, that Coddington, from whom he purchased the farm, had staked off the oyster beds in dispute in front of his farm near thirty years ago. That he claimed the exclusive right to the enjoyment of the oysters, and attempted, and did drive people off who came under a claim of common right; some of them, however, would resist, and several lawsuits grew out of their disputes.

After the plaintiff purchased, he bought oysters, and planted them on the beds, and staked it off. It appeared, that he was at considerable expense in planting, and bought several boat loads, and claimed an exclusive right as far as he had planted, and drove off, as far as he was able, every one who attempted to take oysters without his leave. The staking was no injury to the navigation. The bed from which the oysters were taken is bare at very low tides, but

is below the ordinary low water mark. After the survey of 1818, the defendant came, at the head of a small *fleet* of *skiffs*, and took away these oysters, avowedly to try the right.

The defendant pleaded *not guilty*, and gave notice, that the *locus in quo* was a public navigable river, in which the tide flows and reflows, in which oysters grow naturally, and that all the citizens of the state had a common right to take oysters therein, &c. After the plaintiff had rested his cause,

The counsel for the defendant, Messrs. *Wood* and *Scott*, moved for a non-suit. They contended that the claim under the Sonmans' patent of 1685 and 1689–90, bounded on the river, and therefore was limited to high water mark. That the title by occupancy had not been made out in proof; inasmuch as the people had always claimed their rights while Coddington was in possession, and no acquiescence of this kind would take away a public right, which was now claimed by the defendant. The plaintiff must therefore depend upon his title under the survey of 1818, and, if that will not support him, he must be non-suit.

They contended—·

1. That the right to the soil of navigable rivers, where the tide ebbs and flows, is in the people of New Jersey, and belongs to the state.

That the soil to navigable rivers, the sea and the arms thereof, was not granted by king Charles II. to the duke of York, by the fair construction of the charter; and that, if it was, it was void, as the king could not, on the principles of the common law, make such a grant. That he held the right thereto for great public purposes, as trustee for the public, and subject to the right of the people to navigate and fish, &c. It was public domain and the property of the nation, and on principles of national law, as well as the common law, could not be granted by the king.

2. That if the proprietors had a right to the soil of the Raritan river, they could not grant a right of several fishery, and thus deprive the people of New Jersey of their

rights. The right of common fishery was a vested right, derived from, and sanctioned by, common law principles, and which their ancestors brought over with them.

By the usurpation of the Norman kings on the principles of Saxon liberty, prior to the reign of Henry II. the king might grant a fishery; but since then he is restrained by *Magna Charta,* which simply restored the principles of the ancient law.

That the English pretended to claim this country by the right of discovery, which was a mere inchoate right, and could not be consummated until they found inhabitants and occupied the country.

That the people brought over to this country the same rights which they possessed in England. They had the same rights in navigable rivers here as in England; and the king had no greater rights over the people of this country than over the people of England. *Magna Charta* applied here in full force. This was declared by the Declaration of Independence, and asserted by all our writers of the day; and was one of the great principles upon which our revolutionary patriots founded their opposition to the acts of parliament.

It was further contended, that if the grant of Charles II. passed the right of fishery at all, it was as an incident of the sovereign power, and revested in the sovereign by the surrender, and, on the Revolution, as one of the incidents of sovereignty vested in the people; and none but the legislative power could control the rights of the people.

Again—that admitting that the king of England could grant the soil of the rivers and the right of several fishery, yet his *delegates* or *sub sovereigns* could not; and therefore the duke of York could not grant it, as he was restricted to govern according to the laws and statutes of England. By the grant to the duke of York, he took a feudality, and not an allodium. By the surrender, the rights of property were left as before, but the right of fishery, being a royal

franchise, an act of sovereign power, if it ever vested in the grantees of the duke of York vested as incident to the sovereign power, and, by the surrender, passed with the powers of government

The counsel for the defendant cited, illustrated and relied on the following cases : *Cooper's Justinian* 68 ; *Vattel* 11, 117 ; 2 *Black. Com.* 39 ; 4 *Bac. Abr. Prerogative* (*D.*) 156 ; 3 *Cruise* 297 (2 *vol. Am. Ed.*) ; *Willes' Rep.* 265 ; *Bracton* (*en passim*) ; 6 *Mod. R.* 73 (93) ; *Salk.* 357 ; *Vattel* 99 (*S.* 207 ; 1 *Black. Com.* 167 (107) ; *Allinson's N. J. Laws* 57 ; *Leaming & Spicer, Grants and Concessions* 589, sec. 13 *of Surrender;* 1 *Penn. R.* 391 ; *South. R.* 61 ; *Leaming & Spicer* 627 (*S.* 33) 590, *art.* 13 ; 2 *Penn. R.* 942 ; *Val.* 391 ; *Pat.* 79, 416 ; *Smith's Hist. N. J.* 89, 119, 120, 188, 256, 291 ; 2 *Black. Com.* 417 ; 2 *H. Black.* 182.

The counsel for the plaintiff contended—

That the great principle of the common law respecting property is, to assign to everything capable of ownership an owner. That law assigned the ownership of the sea and the arms thereof, and the navigable rivers to the king. He has not only a right of jurisdiction over the sea, but he has a right of property and ownership of the soil of the *mare clausum,* the arms of the sea and navigable rivers, founded on his ability to possess them by his navies. A subject may have a right in the soil of the sea, &c., by grant from the king ; and in rivers where the tide does not ebb and flow, and not navigable, a grant to the bank gives them the right of soil to the *filum aquæ.*

That whoever has a right to soil covered with water, the right of fishing is annexed to it. That no common law case has been produced denying this position. That the only doctrines that conflict with it are drawn from the civil law. The common law writers all acknowledge the right of the king to grant or alienate whatever he holds in propriety, as the head of the nation.

The doctrine of the defendant proves too much ; as, if true, it shows that he had no right to grant the land of New

Jersey at all, it being as much part of the public domains as the rights of fishery. That what passed under the grant to the duke of York, cannot be questioned in New Jersey after a lapse of two centuries. It has been settled in New Jersey, and we hold all our rights under it. The right of fishing is annexed to the soil, and whoever *has the right* of soil has the right of fishing. The right of the king results from the law assigning to him the ownership of the soil.

In answer to the assertion, that the right to a several fishery does not exist in navigable rivers in New Jersey, it was said, that the cases on which the defendant relies are cases of mere *dicta*, and also are cases of free fishery, which is not founded on the right of soil, and are, therefore, not hostile to our positions. That much confusion has arisen from the inaccuracy in the books, in confounding *free* and *several* fisheries. The plain rule to be extracted from the books is, that while the soil of the sea, &c., remains in the king, the people have a common right of fishing, not a *jus publicum*, which is only applicable to highways. There the *jus privatum* of the subject is charged with the *jus publicum*, which does not belong to the king only, but to his subjects, and cannot be taken away without prostration of liberty. The right of fishery is different, and may be compared to the right of common, which exists until an appropriation of the thing in common, and then ceases.

That the only sound distinction between the right of fishery in navigable rivers and rivers not navigable is, that in the latter it must belong to a citizen, and in the former, *prima facie*, it is in the king, and so long as it remains in him it is public and common. The right of free fishery is a royal franchise, but the right of several fishery is not, and this distinction destroys the whole of the adverse argument. The right of several fishery is a right by reason of, and in concomitance with the land, and founded on, and annexed to it, and when the soil of a navigable river is parted with, the right of several fishery begins. A free fishery is a royal

franchise in the hands of the subject, founded on grant or prescription from the king, distinct from the land. The king still retains the right of propriety in the soil, but parts only with the right of fishery. If this distinction is well founded, then the section of *Magna Charta*, on which the defendant relies, applies only to free fisheries, and not to several. *Black.* and *Cruise* both confine it to free fisheries. But *Magna Charta*, so far as regards this subject is repealed; so says the *Mirror*, *Coke*, &c. If not, it does not apply here; it was local, and therefore could not be of authority here. That although we brought over the great principles of the English liberty contained in what is called the folk law, it was never supposed that the mere statutes (which this part of the *Magna Charta* is) applied here; they were local, and it might as well be said, the game laws, &c., applied.

That the 16th chap. of *Magna Charta*, on which *Blackstone* founds his positions, that since the reign of Henry II., the king could not grant a free fishery, was wholly misunderstood.

That by putting rivers in *defence*, was meant merely barring fishing or fowling in a river, fresh or salt, till the king had taken his pleasure of the writ *defensione reparie. Harg. L. T.* 7.

That neither the proprietors nor colonists ever supposed that the chapters of *Magna Charta* applied; for in the grants and concessions they secured all the essential rights of a free man, and enacted statutes placing the rights and liberties of the citizen on a more rational and secure basis than any part of *Magna Charta*. It was not true that the citizens of New Jersey held their rights under *Magna Charta* as such. The grants and concessions, and the bill of rights of 1698, 1695, contains the principles of civil and religious liberty better defined and more broadly based than anything to be found in the British constitution. In these the settlers contract also, that they shall have lands for

keys, wharfs, and harbors, and also free passage through or
by any sea, sounds, rivers, &c., from the ocean. The set-
tlers found the proprietors in possession of an extensive
country, and they purchased under them, and cannot now
turn round and deny their title, which would be like a
tenant denying the title of his landlord. The proprietors
not only held under the grant from the duke of York, but
they bought the title of the Indians, which some suppose
the better title.

Again—by the principles of the common law, the king
held the soil of navigable rivers in full propriety. He could
grant that as well as the land. If restrained at all, it must
be by *Magna Charta*, chap. 16, Henry II. which was
repealed, did not apply, or did not extend to new discovered
countries out of the dominions of England.

2. That the king did not grant the right of several
fishery.

This state was originally granted by patent, dated 1606,
by king James to Sir Thomas Gates and others, which patent
also included Virginia, Maryland, Pennsylvania, New York,
and the New England states, and was repealed in 1623. It
was again granted, in 1664, by King Charles, to the Duke of
York. At this time the eastern part of New Jersey was in
possession of the Dutch, and before this grant was known
here, the royal governor, Nicholls, conquered it from the
Dutch. Although it was held under the king from that
time, yet it was not formally ceded to him until the treaty
of Breda in 1667, and the grant of 1682 was no doubt made
to obviate the doubts that well might arise, whether, by the
conquest of 1664, the title did not revest in the king. And
the assembly, in 1682, resolved that the land and govern-
ment were purchased together, and that the concessions were
agreed on as fundamental, and the ground of the government
of New Jersey. He granted the rights of sovereignty to the
proprietors, as well as the lands, rivers, soils, waters, and
fishings within certain bounds. It was not necessary that

Arnold *v.* Mundy.

he should use the term *several fishery*, because the same was granted *ex vi termini* by either of those terms. He declared by the grant, that it should be good and effectual in law, notwithstanding any act, statute, or restriction to the contrary.

If then the eastern part of New Jersey was acquired by conquest from the Dutch, and it was thought necessary to validate the grant of 1664, made before the conquest, by the grant of 1682, made after; according to the doctrine of *Blackstone, Holt*, and *Tucker*, he might impose his own laws. If he might impose his own laws, he might delegate the right of making laws, and did so with only one restriction. Wherever the king intended to restrict the right of fishing in proprietary grants, he did it, as in the grant of Maryland. That this is a cotemporaneous exposition by the great lawyers of the day, who were the constitutional advisers of the king, and who inspected these grants.

That by the surrender, the rights of sovereignty and government, and the incidents thereunto, passed. That it is to be taken in connection with the treaty preceding it, in which it is said, that the rights accruing to the proprietors from the seas adjacent, could not be well circumscribed. The right of free fishery passed as an incident to sovereignty in the seas adjacent, which were not granted to the proprietors by the grant of soil, but as annexed to the government. The grant bounds them on the east by the main sea, and on the south by the ocean. But, as sovereign, their right extended to three leagues. This right passed on the surrender to the crown, and by the Declaration of Independence vested in the people of New Jersey, as sovereign, together with the rights of free fishery; which now can only be granted by the sovereign power.

In conclusion it was argued, that the right of the soil remained in the proprietors, and, when they granted the soil, they *ipso facto* granted the several fishery, and therefore it is of no consequence to the plaintiff whether he derives his

title under the Sonman's survey in 1685, or the survey in 1818. The counsel referred to the doctrines in our sister states, as strengthening the view they had taken of the subject, and also to the fisheries on the Delaware. In Connecticut, Pennsylvania, and Massachusetts, it is held that the right of fishery is annexed to the soil, and may be granted.

It was lastly argued, that in this case, the fishery claimed by the plaintiff was a local one, and that the plaintiff's claim was strengthened by the act of planting the oysters. The cases heretofore decided in New Jersey, no way reacheed the present, and it was entirely open. They cited 1 *Con. R.* 382; *Davis' Rep.* 150, *&c.* ; 2 *Black. Com.* 199, 261, *&c.* ; 18, 39; 2 *Bin.* 476 ; 1 *Mod.* 107 ; 1 *Black. Com.* 299 ; 5 *Rep.* 107 ; 4 *Bur.* 2164 ; 5 *Bur.* 2814; 3 *Jac. L. D.* 62, 32, *Constable's case;* 6 *Com. Dig. Prerogative* 55; 3 *Caine's Rep.* ; *Hargrave* 17, 19, 5, 18, 22, 10, 14, 9, 20, 21, 33, 34, 11, 36, 26, 7, 31, 32; *Salk.* 666; 10 *Mass. T. R.* 212; *Leaming & Spicer* 163, *art.* 19, 258, 3, 373, 5, 4, 23, 589, 594, 590, 595, 14, 15, 153, 368, 371, 2, 20, 7, 614 ; 4 *Mass. R.* 144, 527 ; 2 *Johnson* 357 ; *Smith's Hist. N. J.,* 62, 67, 168, 163, 8 ; 1 *Swift* 341 ; *Tucker's Black.* 395 ; 1 *Harris & M'Henry* 564.

KIRKPATRICK, C. J. Abating a little want of courteousness towards the memory of some of the greatest luminaries of the English law, and indeed I may say, some of the greatest men that ever lived, I have been much gratified by the arguments presented by the counsel in this cause. They have investigated the subject with great care, and great ability, and they have certainly thrown much new light upon the view in which it had before exhibited itself to my mind.

The principal question, however, which it presents, and which is now to be determined, is a new question; it has never before come up before the courts of justice in this shape, and in this direct manner, since the first settlement

Arnold *v.* Mundy.

of the province. It is a question of great importance; it involves immense interests; it lies at the foundation of all the rights of fishery hitherto claimed or exercised in the state of New Jersey.

That such a question cannot be ultimately decided, or even beneficially discussed, in hastily rendering an opinion upon a motion for a non-suit at a circuit court, must be manifest to all; and yet, at the same time, what might be said upon it might prove to be exceedingly injurious, by exciting false hopes or false fears, by encouraging those who claim a common right to make unlawful aggressions, or those who claim several rights to make unlawful defences, and in their conflict for superiority, for awhile, not only to disturb the peace of society but also to destroy the very subject matter of controversy.

If it were possible, therefore, to avoid the expression of an opinion at present, and to take a verdict for the damages only, subject to the opinion of the court at bar upon the title, and that too with leave to either party to put the case in such form as that it might be carried up to the court of appeals, as is sometimes done, it would be exceedingly agreeable to me. This, however, I know can be done only by the consent and agreement of the parties, and it is with that view I propose it, and with that view would beg leave to submit it to their consideration.

[The defendant declined the proposition, and called for the opinion of the court, when I proceeded.]

Constrained, as I am, to render an opinion in this hasty manner, I shall merely state my present views of the right which the plaintiff has exhibited, as concisely as I am able, and that without recurring either to books or arguments to support them.

The action is for a trespass in entering upon the plaintiff's oyster bed, and taking and carrying away his oysters. To support this action, the plaintiff must shew a title in himself. This title, in ordinary cases, may be either a fee

simple, or a possession accompanied by right, without a fee simple, or an actual and exclusive possession, without either the fee simple or the right, for such possession is good against all the world, till a better right is shewn. To make out this title, the plaintiff has attempted to shew—1. In the first place, an actual and exclusive possession. 2. In the second place, a possession accompanied by right. 3. In the third place, a fee simple under the proprietors of New Jersey.

As to the first and second of these, they are no other way proved than by shewing the conveyance for, and the possession of, certain lands upon. the shore opposite to this bed, extending, to make the most of it, to low water mark only; and by shewing further, the staking off the said bed, the planting of oysters upon it, and sometimes fishing there, as other people, also, sometimes did.

Upon this I observe, that a grant of land to a subject or citizen, bounded upon a fresh water stream or river, where the tide neither ebbs nor flows, extends to the middle of the channel of such river; but that a grant bounded upon a navigable river, or other water, where the tide does ebb or flow, extends to the edge of the water only, that is to say, to high water mark, when the tide is high, and to low water mark, when the tide is low, but it extends no farther. . The intermediate space, however, between the high water and low water mark, may be exclusively appropriated by the owner of the adjacent land, by building thereon docks, wharves, storehouses, salt-pans, or other structures which exclude the reflow of the water.

All pretence of claim, therefore, to this bed, founded upon the possession of the adjacent land, must fail. And if the plaintiff would set up a possession founded upon another right, that is, upon his staking off the bed, planting oysters upon it, and sometimes fishing there, even if it were a subject matter which could be taken possession of in that way, that possession has not been proved to be either so continued or

Arnold *v.* Mundy.

so exclusive as to establish his right against those having
equal claim with himself. He sets up no prescription ; he
shews no grant to support such possession. He places him-
self in the situation of a fisherman, who, because he has
fished in certain waters for many years, should claim the
exclusive possession and the exclusive right.

Then, as to the title derived from the proprietors. And
first of the form of their conveyance ; and then of their
right to convey.

1. The proprietors of New Jersey are tenants in common
of the soil ; their mode of severing this common right is by
issuing warrants, from time to time, to the respective pro-
prietors, according to their respective and several rights,
authorizing them to survey and appropriate in severalty the
quantities therein contained. Such warrant does not con-
vey a title to the proprietor ; he had that before. It only
authorizes him to sever so much from the common stock,
and operates as a release to testify such severance. This is
manifestly the case, when the proprietor locates for himself.
When, instead of locating for himself, he sells his warrant to
another, that other becomes a tenant in common with all
the proprietors *pro tanto,* and in the same manner he pro-
ceeds to convert his common into a several right. Regu-
larly there is a deed of conveyance upon the transfer of this
warrant, and that deed of conveyance is the foundation of
the title of the transferee.

It is true, that the survey made in pursuance of this war-
rant must be inspected by the surveyor-general, approved
by the board, and registered in their books ; but all this is
for the sake of security, order, and regularity only, and is
by no means the passing of the title. It proves the title has
passed, but it is not the means of passing it. It may be
likened to the acknowledgment of a deed by a married
woman. Her deed cannot prevail against her unless such
acknowlegdment be regularly made and recorded ; yet such
acknowledgment does not pass the title, the deed has already

done that, and it operates from the day of its date. Upon this exception to the plaintiff's title, therefore, I think the defendant must fail. In this case, the warrant and the survey were before the trespass charged, but the recording of it was said to be after. The date of the recording was not mentioned on the record.

2. Then as to the right of the proprietors to convey. And upon this I am of opinion, that by the law of nature, which is the only true foundation of all the social rights, that by the civil law, which formerly governed almost all the civilized world, and which is still the foundation of the polity of almost every nation in Europe; that by the common law of England, of which our ancestors boasted, and to which it were well if ourselves paid a more sacred regard; I say I am of opinion, that, by all these, the navigable rivers, where the tide ebbs and flows, the ports, the bays, the coasts of the sea, including both the water and the land under the water, for the purposes of passing and repassing, navigation, fishing, fowling, sustenance, and all the other uses of the water and its products, (a few things which belonged to the king in his private right, and for his own use only excepted) are common to all the people, and that each has a right to use them according to his pleasure, subject only to the laws which regulate that use; that the property indeed vests in the sovereign, but it vests in him for the sake of order and protection, and not for his own use, but for the use of the citizen; in the same sense in which he holds all the public property and the domains of the crown, that the proceeds thereof may be collected into the public treasury, and applied to the public benefit and the public defence, and that he may have the direct, immediate, uncontrolled enjoyment of them.

I am of opinion that this great principle of common law, in process of time, was gradually encroached upon and broken down; that the powerful barons, in some instances, appropriated to themselves those common rights; that the

Arnold *v.* Mundy.

kings also, in some instances during the same period, granted them out to their courtiers and favorites; and that these seizures and these royal favors are the ground of all the *several fisheries* in England, now claimed either by prescription or grant; that the great charter, as it is commonly called, which was nothing but a restoration of common law rights, though it did not annul what had been thus tortiously done, yet restored again the principles of the common law in this, as well as in many other respects; and that since that time no king of England has had the power of granting away those common rights, and thereby depriving the people of the enjoyment of them.

I am of opinion that when Charles II. took possession of this country, by his right of discovery, he took possession of it in his sovereign capacity; that he had the same right in it, and the same power over it, as he had in and over his other dominions, and no more; that this right consisted in granting the soil to private persons, for the purposes of settlement and colonization, of establishing a government, of supporting a governor, of conveying to him all those things appurtenant to the sovereignty, commonly called royalties, for the benefit of the colonists, who came over here clothed with all the essential rights and privileges secured to the subject by the British constitution; but that he could not, nor never did, so grant them as to convert them into private property; that those royalties, therefore, of which those rivers, ports, bays and coasts were part, by the grant of King Charles, passed to the duke of York, as the governor of the province, exercising the royal authority, for the public benefit, and not as the proprietor of the soil, and for his own use; that they passed from the duke of York to his grantees, and upon the surrender of the government, and as appurtenant thereto, and inseparable therefrom, reverted to the crown of England.

And I am of opinion further, that, upon the Revolution, all those royal rights vested in the people of New Jersey, as

the sovereign of the country, and are now in their hands; and that they, having themselves both the legal estate and the usufruct, may make such disposition of them, and such regulation concerning them, as they may think fit; that this power of disposition and regulation can be exercised only by the legislative body, who are the representatives of the people for this purpose; that in the exercise thereof they may lawfully bank off the water of those rivers, ports and bays, and reclaim the land upon the shores; they may build dams, locks and bridges. for the improvement of the navigation and the ease of passage; they may clear out and improve fishing places to increase the product of the fishery; they may create, improve and enlarge oyster beds, by planting oysters thereon, in order to procure a more ample supply; they may do all this themselves, at the public expense, or they may athorize others to do it by their own labor, and at their own cost, giving them reasonable tolls, rents, profits or exclusive enjoyments; but that they cannot make a direct and absolute grant, divesting all the citizens of their common right; such a grant, or a law authorizing such a grant, would be contrary to the great principles of our constitution, and never could be borne by a free people. These principles I take to be capable of the clearest demonstration. The proprietors, except in a few instances, made probably for the sake of experiment only, have, in their practice, recognized those principles, and the people have uniformly and uninterruptedly enjoyed the corresponding rights, from the first settlement of the colony down to this day, subject only to such regulation and such restraint as the legislature has thought just and right.

From this short statement, it is seen that, in my opinion, the proprietors, as such, never had, since the surrender of the government, any right to, interest in, or power over, those waters, or the land covered by them; and that, therefore, the grant in question is void, and cannot prevail for the benefit of the plaintiff. And, upon this view of the subject, I am constrained to say

Arnold *v.* Mundy.

The plaintiff must be called.

Upon the coming in of the *Postea,* the plaintiff's counsel obtained a rule to shew cause why the non-suit should not be set aside and a new trial granted. This motion was argued in May term, 1821.

*Wall* in support of the motion. This action is brought for a trespass for entering on the plaintiff's soil, and taking and carrying away a quantity of oysters claimed to be his.

It appears, by the evidence, that the plaintiff claims title under : 1. A grant from the proprietors, dated 20th January, 1685, to one Sonmans, bounding him on the Raritan river ; and the subsequent grants under Sonmans, bounding on low water mark.

2. Under a grant from the proprietors, dated 10th April, 1818, including, by metes and bounds, the very place on which the trespass was proved to have been committed.

3. From the act of planting the oysters in question, by his own care and industry.

At the trial of this cause before the Middlesex Circuit, in December, 1819, the plaintiff was non-suited by order of his Honor the Chief Justice, and the object of the present application is, to set aside the non-suit and obtain a new trial.

In the discussion of this application, I do not consider it necessary to spend any time in directing the attention of the court to the language of the grants under which the plaintiff claims, nor to the effect, or diversity, between the two grants, the one bounding on the river, and the other *ex vi termini,* including the very *locus* in question. Assuming, what appears to me altogether incapable of being denied, that if *soil* covered with water is capable of grant, then that the plaintiff in this case, under one or both of his titles, may well claim the *locus.*

Passing by, then for the present, all examination of the evidence, respecting which there is little or no dispute, I shall contend, that the non-suit in this case ought to be set aside, and a new trial awarded.

1. Because the plaintiff had a right of several fishery in this oystery, either for—1. Floating fish, or general, exclusive, and several fishery.   2. Or a right to a local fishery.

2. Because, by purchasing or gathering the oysters, depositing them on the premises, and staking them out, he acquired such a right to them as would entitle him to an action against any person who should take them without his leave.

1. In endeavoring to establish the first proposition, it will be necessary to investigate—1. The right of property to the soil of navigable rivers at common law, and to inquire, whether it was the subject of grant.   2. The right of property to the soil of navigable rivers in New Jersey, and whether it is the subject of grant.   3. Whether by the grant of the soil of navigable rivers the right of several fishery passes, as inseparable.

1. The great principle of the common law of England is, to assign an owner to every thing capable of ownership, and whatever hath no other owner is vested by law in the king. 1 *Black.* 298–9 ; 2 *Black.* 15, 261–2.   By the English law, or constitution, all land is supposed to have been the property of the king, at some time, and to be held mediately or immediately of him.   6 *Com. Dig.* 60 (*D* 63).   This is said to be derived from the feudal system. 1 *Black.* 264. The common law has also assigned the ownership of navigable rivers, of arms of the sea, and even of the *mare clausum*, to the king. The king hath the sole interest in the soil of navigable rivers, and in the fisheries thereof.   *Davies* 155.   The king has the property *tam aquœ, quam soli*, and all profits in the sea, and all navigable rivers. 5 *Com. Dig.* 102 (*A, B*). The king is the owner of the sea and soil.   *Har. L. T.* 10, 11,

Arnold *v.* Mundy.

14, 17, 18; 5 *Coke, Constable's case* 107; 7 *Coke* 18; 2 *Black.* 261. The sea is the proper inheritance of the king. *Davies* 152.

This doctrine of the common law is in perfect accordance with the law of nature and of nations. Every nation, by the law of nature and of nations, is the proprietor of the rivers, as well as soil, within its territorial limits. 1 *Rutherf.* 91, *sec.* 111 *Vattel.* 120, *sec.* 266. By the same law, the sea itself, to a certain extent and for certain purposes, may be appropriated and become exclusive property, as well as the land. *Vattel* 127, *sec.* 287; *ib.* 125, *sec.* 278. Whether the soil and rivers thus belonging to a nation, or any and what part of it shall be enjoyed in common by all her citizens, or whether it shall be appropriated to the exclusive use of individuals? and if so appropriated, by whom such appropriation shall be made? are questions which depend on the will of the nation herself, as declared in her constitution and laws. The nation being the sole mistress of the property in her possession, may dispose of it as she thinks proper. *Vattel* 116, *sec.* 257. She may dispose of what is common to all the citizens. *Ib.* 116, *sec.* 258. Or she may confer the right on the sovereign. *Ib.* 117, *sec.* 251. In that case, he becomes the organ of the nation. *Ib.* 118, *sec.* 262.

By the English law, or constitution, the right of disposing of the public domains is vested exclusively in the king; and he had, until long after the reign of Charles II. the right of alienating them for ever. 1 *Black.* 286; 3 *Cruise* 14, *sec.* 5; *ib.* 565, *sec.* 16. He may also grant the soil of navigable rivers; and he may grant a free fishery without the soil. *Har. L. T.* 15, 17, 18, 19, 21, 22, 32, 33, 34, 56; 6 *Com. Dig.* 60 (*D* 611); 4 *Bur.* 2163; *Davies* 150. These authorities also prove that a subject may prescribe for a free or several fishery in navigable rivers and arms of the sea. A prescription cannot be for what may not be granted. 2 *Black.* 265; 7 *Coke* 18.

From these authorities, it abundantly appears, that, by the principles of the common law, a subject may have a right of soil, and also a right of fishery, in navigable rivers' and arms of the sea, by grant or prescription. No case of pure unmixed common law origin can be produced against these positions. The case in *Bracton* is evidently borrowed from the civil law, and he quotes the very language of the Justinian code. In *Davies* 150, it is expressly denied to be the doctrine of the common law. This case, in *Davies*, is also recognized as good authority by Justice Yates, in 4 *Bur.* 2165, and by Chief Justice Kent, in 3 *Caines* 318. ' And Lord Hale's treatise, in *Har. L. T.* who lays down the law in accordance with *Davies*, is cited with approbation, and recognized as sound law by Chief Justice Spencer. 17 *John.* 209. Indeed, nothing can be more variant than the civil and common law on the subject of aquatic and riparian rights. By the civil law, every citizen has the right to use the land of another, on the banks of navigable rivers, for towing. The common law denies that right. 3 *Term Rep.* 253; 17 *John.* 209.

The grant from King Charles II. to William Penn, of our sister State of Pennsylvania, grants the soil, and rivers, and fisheries within its limits. Chief Justice Tilghman (2 *Bin.* 476) expressly holds, that by this grant he became entitled to the fisheries. And a similar principle is recognized, (4 *Mass.* 140; 17 *John.* 203) as to the right of the people to grant, by express words. Even in England, then it may be fairly concluded, from a careful examination of the cases cited, that the king could lawfully grant the soil of navigable rivers and arms of the sea to a subject, and that it might be held either by *grant* or *prescription*, which always presupposes a *grant*.

2. Could the king grant the right of soil to the navigable rivers in New Jersey, and did he grant it? This opens a singular discussion, at this day, in New Jersey, when it is a fact, proved in the deduction of all the titles in New Jersey,

that he did grant the lands; and that every foot of land now held by a freeman in New Jersey is traced up to the grant of the king. What had become mere fiction in England is an undisputed fact here.

All lands in New Jersey were held immediately of the king. He granted this, as well as all the other colonies, as whim, caprice, favor or avarice dictated. They were considered as his private domains, and were held and granted as such. This doctrine is not varied by proving, that the king became entitled to the lands and rivers in this, then howling wilderness, in virtue of his prerogative; that he held them *jura coronæ*. If so, still, by the law of England, he was the organ of the nation to alienate them; and admitting, (what is altogether denied) that by the conquest, or discovery, of this country, the people of England became entitled to a common right of fishery in the navigable rivers, arms of the sea, and seas of this extensive territory, yet it has been already proved, that, by the common law of England, as well as the law of nature and nations, the king, as the organ of the nation, might grant them in propriety to an individual, and thus destroy the right of the people; and that his grant would be binding on the people. It is of no importance, as to the validity or effect of the grant he did make, whether he derived his title to this country from discovery or conquest. In either case, it vested in him in absolute propriety, and, by the laws and constitution of England, he was authorized to alienate it, as he saw proper, without reference to the good of the people, or the will of parliament. He would have had this right on the general principles of national law. *Vat.* 101, *sec.* 210. His grants, even of the common rights of his subjects, would be binding on them; and, if so, how much more binding will it be on those who come in under the very grant, and have recognized it. It is to be remembered, that this is not a question between the people of England, claiming that their agent or organ had exceeded his powers, but it is a question raised by those who

derive their right to the soil, and, of course, to the participation of the rights founded on it under the very grant which is now sought to be circumscribed or destroyed.

It is a matter not clearly settled, how the king acquired his right to this country. *Blackstone*, 1 *Com.* 108, supposes that he obtained it by treaties, or the right of conquest. *Smith*, in his *Hist. of N. J.* 8, insists that it was acquired by the right of discovery. The right, however derived, was strengthened by the purchase of the Indian title, which was made by the proprietors. The king of England very early exercised the right of granting this country. In 1606, King James I. granted this province, together with Virginia, &c., by patent, to Sir Thomas Gates and others. *Smith's Hist. N. J.* 17. This patent was repealed in 1623. It remained in the crown until March 12, 1664, when King Charles II. granted it to his brother, the duke of York. *Smith's Hist. N. J.* 59. On June 24, 1664, the duke of York granted it to Sir George Carteret and Lord Berkley. At the date of this grant, the eastern part of New Jersey was in possession of the Dutch, who had made considerable settlements in Bergen, Essex, Middlesex, Monmouth and Somerset. In August, 1664, before the last mentioned grants were known here, Colonel Nicholls, the royal governor of New York, conquered it, together with the fort on the Delaware, at Newcastle, from the Dutch. *Smith*, in his *Hist. N. York* 29, 30, 31, says, it was re-conquered by the Dutch, in 1673, and given up by the peace of 1674. This is somewhat doubtful. Captain Philip Carteret, the first proprietary governor, with the first settlers under Carteret and Berkley, arrived in New Jersey in the summer of 1665, and, by the treaty of Breda, in 1667, New Jersey was formally ceded, by the Dutch, to the king of England. This gave rise to the subsequent grant, made on the 29th July, 1674, by the king to the duke of York, and by the duke to Berkley and Carteret. *Leaming & Spicer* 41 to 50. *Smith's Hist. N. York* 32. This grant is to receive a liberal con-

struction in favor of the grantees. It contains the words
" certain knowledge," " mere motion," and " special grace,"
and it purports to be made for a valuable consideration.    3
*Cruise* 567, *sec.* 11, 12.  The words of the grant, also, are
very broad and comprehensive—" All the lands, islands,
soils, rivers, harbors, waters, fishings, &c." *Leaming &
Spicer* 4.  These words are technically apt to pass, as well
the soil of the rivers as the fisheries.  2 *Black.* 18; *Har.
L. T.* 18, 33; *Dav.* 150; 5 *Com. Dig.* (*D* 290).  It is
abundantly manifest from the cotemporaneous history of
England, that this grant and charter, as well as all other
grants and charters of the American provinces, were framed
with great deliberation; were submitted to the law officers
of the crown, and every word well weighed and understood.
By looking at other grants, it will appear that when the
king meant to reserve the right of fishery he did it by
express words.  It is so in the grant of Maryland to Lord
Baltimore.  1 *Har. & M'Hen.* 564.  These charters and
grants are great state papers ; and considering them as such,
and referring to the situation of England at the time, this
idea is strengthened.  The policy of the crown, as well as
that of the English nation at that time, was to people
America as rapidly as possible.  It is obvious that these
grants of immense territories were designed not' merely for
the benefit of favorites, but to foster, promote and encourage
the settlement of the country.  Hence, the king not only
granted the territory in the most ample and comprehensive
terms, so as not only to divest himself and the people of
England of all propriety in the soil and rivers, but also the
right of sovereignty and of self-government, unrestricted in
all particulars, so that they be not contrary to the laws of
England, but, as near as may be, conformable thereto.

At this time it was well known that much discontent pre-
vailed in England among those who considered themselves
persecuted for their religious opinions ; and the spirit of
liberty, which had destroyed the sceptre of Charles I. and

brought him to the block, was not wholly extinguished by the restoration of his son. There were still many gallant and patriotic Englishmen who cherished the sacred flame of liberty, and who viewed the prerogative of the crown, in the hands of the Stuart dynasty, as dangerous to the rights of the people; and who detested the licentious and tyrannical conduct of one brother, and dreaded the religious bigotry of the other. Admonished by the fate of their father, these royal brothers might wish to avoid it, and instead of repressing the spirit of emigration which had then seized those who were remarkable for boldness, enterprise, and attachment to civil and religious liberty, they might have had the wisdom to hold out inducements to the Hampdens and Cromwells, if any still remained, to seek their fortunes in the wilds of America and there create new theatres for action.

The grant to the duke of York (*Leaming & Spicer* 6) not only contains the most ample cession of the domain and sovereignty of the country, but gives him the right of interdicting any persons from settling that he may see proper. The grant from the duke to Berkley and Carteret is as full and ample as the grant to him, except as to territorial limits. There can be no question that at that period no one in England seriously supposed that this grant violated the rights of the subject, or transcended the prerogative of the king. It was not supposed that a subject of England, as such, could claim a right in New Jersey, hostile to the grant made by the king. Could he have set up the pretences of the adverse counsel, that the king held the colony merely as trustee for the people, and that a grant made to an individual without consideration, and for favoritism, was void? Could he have set up the common right of fishery, as an unalienable right, vested in the king for great public purposes? and, as one of the people of England, made good his claim to the waters of this wilderness? The very laws upon which his claim must be based had already sanctioned

the cession and grant of this country to individuals. It was no longer the property of the nation; their lawful agent had alienated it.

It is manifest that our ancestors, who, I may venture to assert, felt as ardent a love of liberty, and understood their rights as Englishmen, as well, at least, as many who prate about the rights of the people, and common right, and other imposing terms, had no such opinion. These men, whose love of civil and religious liberty led them to abandon the delights of civilized life, the tombs of their ancestors, and all those endearing ties which bind man to the place of his birth to encounter the privations, hardships and dangers of settling a wilderness, peopled only by savages, knew well the rights, the powers and privileges of the proprietors, under these grants. Before crossing the Atlantic, they ascertain the terms upon which they will be permitted to settle under the proprietors. The grants and concessions, dated 10th February, 1664, is the *Magna Charta* of New Jersey, and therein the settlers stipulate for *a representative government; a free passage to or through any seas; lands for wharves, keys, harbors, &c., and that they shall not be liable for trespasses on waste lands.* *Smith's Hist. N. J.* 163. *Leaming & Spicer* 20, 25, *secs.* 3, 6, 8. In 1682, the colonial legislature resolved, that the government and laws of New Jersey were purchased together. *Smith's Hist. N. J.* 163. In 1683, they published their fundamental rights; (*ib.* 153) and, in 1698, they republished them, containing a proviso, that nothing therein contained should infringe any grant or charter already granted. The first settlers made their own terms, and when we find them treating for the right of navigation, and of harbors, &c., which are part of the *jus publicum,* upon the principles of all laws, and securing them by contract, and silent as to the right of fishery, it furnishes a strong argument in favor of our position, the more

especially, as their brethren of West Jersey, deriving under. the same grant, actually stipulate for the right of common .fishery. *Leaming & Spicer* 390.

. · In 1676, Lord Berkley sold his moiety of New Jersey; · and in 1682 the executors of Sir George Carteret sold his moiety. In 1685, the duke of York, to whom the grant had been made, became king. At that time, the province, having passed out of the possession of the courtiers and favorites, and increased very rapidly in population and wealth, became an object of jealousy to the government at home, and many pretexts were used to resume the government. *Smith's Hist. N. J.* 65. It is to be remarked, however, that even then it was never suggested, by those who were fertile in devices to avoid charters and patents, that the king had transcended his prerogative in making the grant. It was then pretended by the adherents of the crown, as our adversaries now argue, (and indeed it is the main pillar of their argument,) that the right of government, although lawfully conveyed to the duke of York, could not be alienated by him or his alienees. *Smith's Hist. N. J.* 570. Then that doctrine was supposed to partake of the arbitrary nature of the Stuart prerogative, and to be hostile to the interests of the people. Hence it was resisted by the people then inhabiting here, and gave rise to the resolutions of 1682, 1683 and 1698, already quoted, in which the rights of the proprietors are distinctly asserted. It is a singular position, that our ancestors coming here under an express recognition of the rights of the proprietors under the grant to the duke of York, and purchasing part of the very lands passed thereby, could destroy or circumscribe the rights of those under whom they held. It would be analogous to a. tenant denying the right of his landlord.

· 3. Having established, as is submitted, that on the principles of the common law the king could grant the soils, rivers, lands and fisheries within New Jersey, and that, by express words, he did grant them to those under whom the

proprietors claim title, it remains to shew, that as owners of the rivers and soils, independent of the grant of the fishings, the proprietors became entitled to a several fishery.

Fresh waters belong, in propriety, to the owners of the soil on each side. *Har. L. T.* 5, 7; 2 *Black.* 261; *Dav.* 152; 4 *Bur.* 2162. This doctrine is recognized by Chief Justice Kent, in 3 *Caines* 319, and by Chief Justice Spencer, in 17 *John.* 209. . In these rivers, the right of fishing is annexed to the soil, and passes by a grant of it, and is recovered by the description of land covered with water. *Har. L. T.* 5, 7. The distinction in the books between salt water rivers, navigable rivers, and rivers in which the tide ebbs and flows, and fresh water rivers not navigable rivers, and rivers in which the tide does not ebb and flow, for they are different expressions for the same thing, is local, and arises altogether from the nature of the rivers in England. There all their rivers, so far as the tide ebbs and flows, are salt, and so far navigable; and those in which the tide does not ebb and flow are fresh, and not navigable. 2 *Con. Rep.* 4; 2 *Bin.* 476. That is not so here. The Delaware, Susquehanna, Schuylkill, &c., and in fact all our great rivers, are navigable beyond the influence of the tide and the salt waters. The doctrine there was founded on the nature, extent and situation of their rivers, and adapted to it; and the grant of lands on salt water rivers, bounding on the river, carried only to low water mark. In fresh water rivers, the same words in a grant would carry to the *filum aquæ.* This was the rule of construction. But even in salt water rivers, the grant, by the king, of the soil, &c., conveyed also the right of fishery as an incident. In this sense is to be understood *Har. L. T.* 11, 15; 4 *Bur.* 2163; 3 *Jac. L. D.* 82. If the distinction in the English books on this subject is local, it may be questioned whether it applies here. Our ancestors, on emigrating, did not bring with them the whole body of the common law, as well that establishing general principles

applicable to a new country, as that founded on the peculiar state of the country from which they came. They brought the common law purified from its local dross. Every thing of a mere local origin was left on the other side of the ocean, and we have gradually substituted in its place a local common law of our own. Our ancestors brought the folk law merely, as contradistinguished from the *jus coronæ* and the local common law of England. Besides, they settled this country under royal charters defining their rights, or under grants made to individuals, which, in many respects, varied from the principles of the common law, as in this very grant of New Jersey the king parted with many of his prerogative rights as to harbors, ports, rivers, &c.

By the grant of the soil of a navigable river, on the admitted principles of the common law, a right of several fishery passes. *Har. L. T.* 5, 7, 15, 33, 34; 2 *Black.* 39; 4 *Bur.* 2163; 5 *Com. Dig. Pischary.* A right of several fishery is in concomitance with, and founded on, the right of soil, and is co-extensive with it; and whoever has the right of soil in a navigable water has, also, the right of several fishery. Under the grant from the proprietors, offered in evidence, the plaintiff acquired a right of several fishery generally, and without limitation, co-extensive with his right of soil.

2. But if he did not acquire a right of several fishery for floating fish, he acquired a right to erect a local fishery or an oystery, within the limits of his grant, and was entitled to recover for an infringement of that right. *Har. L. T.* 18 to 23; 4 *Mass.* 527. This doctrine is supported by decisions in our sister states. 1 *Swift.* 341–2; 4 *Mass.* 527; 10 *Mass.* 210; 2 *Bin.* 475.

The right of several fishery exists in New Jersey, in the Delaware and other navigable streams, and this right has been sanctioned by a decision of Chief Justice Kinsey, at the Gloucester Circuit. It is recognized and protected by various acts of the legislature. The fisheries are taxed as

private property, distinct from the land, and above a hundred are now enjoyed on the Delaware. It also exists in Pennsylvania, on the shores of Staten Island, in Virginia, Maryland, &c. This proves that there is a general local common law on this subject, pervading all the states where the waters afford sufficient inducements for the owners of the banks to erect fisheries.

Whenever the soil of a river is granted by express terms, or even constructively, it becomes, so far as regards the right of fishery, a private river, and the principles of the common law, as to private or fresh water rivers, attach. Whenever the soil of a river passes, by grant or otherwise, out of the hands of the sovereign of the country, it becomes, *ipso facto*, a private river and the subject of a several fishery. How can rights, which are merely accessary, exist in the hands of the sovereign after he has parted with the principal! Several fishery is an incident to the soil; while it remains the property of the people the common law right of free and common fishery continues; but when the soil is sold or conveyed, the incident also passes. 1 *Rutherf.* 92. This doctrine is expressly asserted by the commissioners appointed by this state to treat with New York respecting our eastern boundary. They were appointed by the legislature; reported their proceedings to the legislature; and the legislature, by publishing their report at the public expense, and without comment, have adopted their reasoning; and it becomes, as well from that circumstance as from the great learning and talents of the commissioners themselves, entitled to very great weight in our tribunals. It fully supports this proposition. *Report of Commissioners* 15. The proprietors, also, from a very early period down to the present time, have been in the practice of granting the soil of navigable rivers. On the trial, many such grants were shewn, and they, at least, prove a cotemporaneous construction of the grant under which they held. While the rivers remain in the hands of

the sovereignty of the country, the right of fishery therein is public and common; when it is granted to an individual, it becomes a several fishery. This is consistent with the doctrine of the natural law, as laid down in *Rutherf.* 91.

The *jus publicum* in all rivers is the same. The *jus publicum* is the right of navigation; the right of making laws for the conservation of fish and their fry; and to regulate the mode and right of taking them. *Har. L. T.* 22, 23, 36. Lord Hale nowhere considers the right of fishery as a part of the *jus publicum*, properly so called. This doctrine perfectly harmonizes private rights with public rights.

It will here be necessary to anticipate some of the arguments of the counsel of the defendant, that they may be apprized of the answers that will be relied on.

1. It has been contended, and no doubt will be again, that the right of fishery is a royal franchise which the king holds for great public purposes, in trust for the benefit of the people, and cannot, from its very nature, be conveyed.

The fallacy of this position consists in not distinguishing between the different kinds of fisheries. Fisheries are—1. Several. 2. Free. And 3. Common. 2. *Black.* 39. 1. The right of several fishery, as already shewn, is founded on, and annexed to, the soil, and is by reason of, and in concomitance with, the ownership of the soil. When the soil of a navigable river is granted the right of several fishery therein begins. 2. A free fishery is altogether different; it is a royal franchise, distinct from the land and founded on grant or prescription. By the grant of a free fishery, the right of fishery only passes, the right of soil remains in the king. 2 *Cruise* 297, *sec.* 70; 5 *Com. Dig.* 290. A free fishery separate from the soil, appropriating not the land but the fishery, might, on sound principles of policy, be prohibited in every well regulated government. If permitted, every part of the British channel might have been parcelled out among courtiers and favorites, and thus the ocean itself made tributary to the avarice of man. The right of several

fishery, however, springing from, and connected with, the possession of the soil, stood on wholly different grounds. It gave an incentive to industry, and would benefit the public. The sound rational principle on which the distinction between the ownership of rivers navigable and not navigable rests, is, that, as to the latter, a subject must be the owner of it, and may be of the former, but *prima facie* it is in the king, and, until granted, he holds it as the agent of the people and for their benefit; and it is public and subject to—3. The right of common of fishery. But this right of common of fishery continues only while the soil remains in the public. But there are not wanting authorities, among those already cited, to prove that the king may grant a free fishery. But the position now contended for is, that the authorities which deny the right of the king to grant a fishery in navigable waters, when properly understood, apply only to *free fisheries*, which is a royal franchise, and not to *several fisheries*. This distinction reconciles all the seeming contradictions in the books.

2. That the king was prohibited by *Magna Charta* from granting a fishery.

The 16th and 23d ch. of *Magna Charta* are relied on to support this position. Ch. 17th is expressly stated by the *Mirror* to be obsolete. 3 *Cruise* 297; 1 *Cok. Inst.* 30, 37; 5 *Jac. L. D.* 4. This section is considered by Lord Hale (*Har. L. T.* 7, 8, 9) as designed to take away the right of the king in *private* rivers, an interest of pleasure or recreation, which he enjoyed by the *writ de defensione ripariæ*, that is, to put the rivers in *defenso*, to bar fishing or fowling till the king had taken his pleasure. And that the 23d ch. applies to weirs, kidells, and obstructions. *Har. L. T.* 9, 22.

This exposition agrees much better with the character of *Magna Charta* than Blackstone's. *Magna Charta* proceeded from a struggle between the barons, bold, turbulent, rapacious and oppressive, and kings, weak, timid and tyrannical. Let us not be the slaves of mere words. Whatever benefit

has accrued to the liberties of the world from *Magna Charta*, has arisen more from chance than design. The barons armed themselves. not to support the rights of the people, but to protect their own usurpations upon the rights of both monarch and people, and in the collision between the two oppressors, some. principles of liberty were struck out. It was a mere streamlet. issuing, as if by a miracle, from the rock of tyranny, struck not by the arm of inspired patriotism, but by a casual blow of the sword of the mailed baron, in the attempt to deck himself in the robes of royalty. But these chapters of *Magna Charta* are mere statutes, and it is held in Westminster Hall, that none of the statutes of England, as such, applied to the colonies. 1 *Salk.* 666; 2 *Ld. Ray.* 1274.

We hold not our liberties in this state by the provisions of *Magna Charta*. Every freeman, wherever his lot may be cast, will turn to that instrument with pride and satisfaction, as a noble but rude and incomplete monument of the liberties of man. It is the corner-stone of the liberties of Englishmen, and the first landmark in tracing out the liberties of the subject after the Norman usurpation.

But the history of liberty in this state is happily not lost in the recess of time. It is to be found in the grant from the king to the duke of York, and the grants and concessions between the proprietors and the settlers, and the bill of fundamental rights. Our ancestors stipulated for their own rights, and built up a great system of republican liberty, based on the natural rights of man and protected by representative government, in which they have interwoven all the essential principles of civil and religious liberty; I turn to it with pride and pleasure. *Leaming & Spicer* 162–3, *secs.* 16, 19. Beside it, the much boasted *Magna Charta* of England dwindles to a twinkling star in the galaxy of freedom. It embodies every thing worthy of preservation in *Magna Charta*, and was the most perfect system of civil and religious liberty .existing in the world at that period.

Arnold *v.* Mundy.

It is the foundation of our present republican system, lopped of the overshadowing branches of royalty, but the trunk remains entire and vigorous. On it has been engrafted, the sovereignty of the people, equal laws and equal rights, and, to this day, the graft is nurtured by the sap and life-blood of the parent stock. These form the *Magna Charta* of New Jersey. To trace *our liberties* to *Magna Charta* may indeed gratify a feeling akin to that of pride of ancestry, but it is wholly deceptive. In all the struggles between the people and the proprietors, on the one side, and the court party, on the other, during the proprietary government, and after the surrender, between the people and the royal governors, it will be found that the patriots of the day constantly refer to the grants and concessions, and the fundamentals, as the basis of their rights. *Leaming & Spicer, passim.* Indeed, the collection of the original documents, so often referred to, made by *Leaming & Spicer*, was occasioned by the desire of the legislature to rescue from oblivion documents so essential to their just rights and liberties. Besides, these chapters of *Magna Charta* are, on the face of them, local and confined to England, and cannot, in fair reasoning, be extended to the rivers in America. With the same propriety it might be insisted, that the provisions contained in *Magna Charta* respecting game, forests, &c., were applicable. The legislature of New Jersey, at a very early period, enacted similar laws respecting the obstruction of navigable waters. *Paterson* 15.

3. That, by the surrender made by the proprietors to Queen Anne, on April 15, 1702, the right of fishery in the navigable waters of New Jersey, which, if it passed to the proprietors at all, passed as an incident to sovereignty, became re-annexed to the crown. If the former propositions contended for are supported, there is no force in this argument; because, if the king had a right to grant soil covered with water, and fisheries, and did grant them, they became severed from the sovereignty, and could not be re-annexed

but by terms as broad and comprehensive as those by which
they were granted.    In the grant, the water, soil, and
fisheries are passed in express terms, and not constructively
or as incident to the sovereignty, and it cannot be gravely
pretended that it varies it, because they were conveyed by
the same instrument.    This argument is a *petitio principii*;
it assumes the very point in debate, and which is denied by
us.    A reference to the memorial of the proprietors, which
preceded the surrender, and the surrender itself completely
dispels this idea.    In the memorial, the proprietors expressly
separate the idea of government and property.    *Leaming &
Spicer* 607.    They surrender merely the powers of govern-
ment.    *Ib.* 613–4.    It was accepted as such.    *Ib.* 617.    By
their memorial, the proprietors, previous to the surrender,
stipulate for the soils and lands of the provinces and the quit
rents, (*ib.* 589, *sec.* 1) which is granted.    *Ib.* 594.    That the
twenty-four proprietors may be lords of the soil &c., (*ib.* 590,
*sec.* 9) which was granted.    *Ib.* 595.    That all lands, goods,
and chattels of traitors, felons, deodands, fugitives, and per-
sons outlawed, waifs, estrays, treasure-trove, mines and
minerals, royal mines, wrecks, royal fish that shall be found
or taken within East Jersey, or by the inhabitants thereof
within the seas adjacent, to remain to the proprietors, with
all the other privileges and advantages, as amply as in the
grant and confirmation of March 14, 1682.    *Ib.* 590, *sec.* 13.
The lords of the council of trade and foreign plantations,
who had the assistance of all the great law officers of the
crown, in answer say, that this may be reasonable, except as
to the goods and chattels of traitors, which are matters of
state ; nor can right accruing to the proprietors from the
seas adjacent be well circumscribed &c.    *Ib.* 596.    This
memorial, and the answer and surrender, are to be consid-
ered as a treaty between the proprietors and the queen, and
are to be taken in *pari materia.*    The proprietors knew that
they held the right to treasure-trove, royal fish, &c., as
incident to the grant of sovereignty, (1 *Black.* 299) and,

unless provided for by express stipulation, it would again vest in the crown on the surrender of the sovereignty. The lords to whom the memorial was addressed, admit that the right of the proprietors to the seas adjacent could not be well circumscribed, so far as they passed by the king's grant, "westward of Long Island, bounded on the east by the main sea, and hath on the west Delaware bay or river, and extending southward to the main ocean, as far as Cape May, at the mouth of Delaware bay." *Leaming & Spicer* 10. So far, then, as these limits extended the proprietors remained lords of the soil, and their rights could not be well circumscribed, is the strong language of the lords of the council of trade and foreign plantations, and may be considered as the opinion of the great law officers of the crown, as they were constantly applied to by the board of trade in all important matters.

But the proprietors, as sovereigns, by the law of nations and of England, were proprietors of the sea to the extent of three leagues from the shore, and as such, lords of the soil covered with water. But this right they held as sovereigns, not as lords of the soil, and when they surrendered the sovereignty it passed to the crown. By the declaration of independence, this right vested in the people of New Jersey; previous to the surrender, the right of granting a free fishery within this three leagues was in the proprietors; after the surrender, and until the declaration of independence, in the crown; and since, in the people of New Jersey. No grant of a free fishery has ever been made within these waters, and none can now be made but by the legislature of New Jersey. That they have the right so to do, upon the principles of the common law, I think has been already shewn. The right of the proprietors, as to the soil, and everything else that passes by the grant to the duke of York, untouched by the surrender, was not affected by the revolution. That glorious event found them lords of the soil, and it left them such. It was not intended to take away, but to secure rights.

2. But even if the court should be of opinion that the soil of the rivers below low water mark and the right of several fishery were not capable of being granted, yet we contend that the plaintiff, by gathering, or purchasing and planting the oysters upon land which he claimed, and bestowing his own labor upon them, and staking them off, thereby shewing that he did not throw them into the water to abandon them, acquired a right therein which is protected by law, and will enable him to maintain an action against any one who disturbed him in the enjoyment thereof. He acquired such right upon the principles of the natural law; (1 *Rutherf.* 91) upon the principles of the civil law; (*Vattel* 114, *secs.* 250-1; *Domat.* 475, *secs.* 3, 4, 7, 9; 280, *secs.* 24, 27, 28, 29) upon the principles of the common law; (2 *Black*, 8, 9, 391, 392, 402; 3 *Chitty's C. L.* 359; 5 *Esp. R.* 62; 1 *Camp.* 309) and by the law of New Jersey, 1 *Pennington* 397. The oysters belonged to him before they were planted; and placing them in a navigable water congenial to their growth and sustenance, accompanied with every *indicia* of ownership, cannot be considered as divesting him of any rights previously vested. The oyster is a fixture, and will not remove from the place where it is deposited. If a whale is captured and left within the tide waters no man has a right to take possession of it. So, if floating fish are caught and placed in a car. So, also, of a piece of timber secured by being drifted off by the tide; the right of the original owner remains. Every man may deposit his goods in the highway. He may thereby subject himself to an action or indictment for a nuisance, but he does not lose his right of property. In no case does a man lose a right of property vested in him by the principles of law, by placing it in a public highway, or a navigable water subject to the *jus publicum.*

Upon these principles, it is respectfully submitted, that the non-suit ought to be set aside, and a new trial awarded.

Arnold v. Mundy.

*Wood,* in answer.—The main question in the present case is, whether the proprietors have a right to grant a several fishery in a navigable river, to the exclusion of the right of common fishery in the citizens generally ? The right of the citizens has always been used, and the court must see their way clear before they will attempt to deprive them of it.

We contend that the right of the soil in navigable rivers, and the sea at the distance of three leagues from the shore, and the right of jurisdiction therein, with the exclusive right to what are called royal fish, are vested in the state, the sovereign power, as a part of the prerogative of the sovereign power; and that the citizens have a common vested right of fishery therein ; and secondly, that if the above rights, ascribed to the state, be in the proprietors, they hold them subject to the common right of fishery of the citizens at large, of which they cannot deprive them.

In establishing these propositions, it will be necessary to consider, what are the rights of the king of England, in relation to these subjects. By virtue of his prerogative, he has the allodium of the soil in navigable rivers and the sea, as above mentioned, with an exclusive right to royal fish. His subjects have a common of piscary therein, which is a vested legal right, and may be pleaded. These rights of the king are part of the public domains, vested in him for public purposes. The king cannot transfer them to a *private individual* for a *private purpose,* much less, by attempting to do so, can he destroy the common right of fishery, the vested interest of the subject. This doctrine is not peculiar to the common law. It is the doctrine of the civil law, which is the basis of the codes of modern Europe, and which goes much farther. *Coop. Justin.* 67, 68, *lib.* 2, *tit.* 1, *secs.* 1, 2 3. Positions supporting this doctrine are frequently to be met with in treatises on national law. *Vattel* 11, *book* 1, *chap.* 3, *sec.* 34; 117, *book* 1, *chap.* 21, *secs.* 260, 261.

These doctrines apply with more force to England. Their government is a limited monarchy; their king is only a

*branch,* and the *executive·* branch, of the sovereign power.
Such a power in the king, as is contended for on the part of
the plaintiff, which is in its nature legislative, is altogether
heterogeneous and destructive of the harmony and order of
the British constitution. Their parliament, alone, can have
the right of transferring the public domains of the nation.
The king may grant his private property, his ordinary reve-
nue, lands vested in him upon feudal principles, but not the
public property. *Magna Charta,* with *Lord Coke's* com-
mentary upon it. 1 *Reeves' Hist.* 234; *Chitty on Fisheries ;*
1 *Esp. Dig. part* 2, 270 ; 2 *Black. Com.* 39 ; *Bac. Abr. tit.*
*Prerogative, book* 3 ; 3 *Cru.* 297 ; *Willes* 268 ; *Warren* v.
*Matthews,* 6 *Mod.* 73. The king could not grant the tempo-
ralities of the church, which are in him, before the 18th,
Edward III. 1 *Black. Com.* 282. The authorities cited by
the plaintiff's counsel to prove, that upon the principles of
national law, the public waters may be appropriated, only
prove that they may be appropriated by a nation, to the
exclusion of others. They do not touch the question, whether
a king may appropriate them to the exclusion of his subjects ?
It is true the Norman kings usurped this power of transfer-
ring the public waters to private individuals, their favorites ;
but this power was restrained by *Magna Charta,* the great
object of which was to restore Saxon liberty. *Black. Tracts,*
*Introduction to Magna Charta* 289. The reason of allowing
such grants of *Magna Charta* to prevail, as were made prior
to the reign of John and in the reign· of Henry II. was no
doubt because such rights were vested in the hands of inno-
cent alienees, and the barons of those days were moderate
in the work of reformation. Those grants made prior to
*Magna Charta,* and allowed by it, are no doubt the founda-
tion of· all the several fisheries and exclusive ownerships of
navigable waters in England, which are now claimed by pre-
scription and proved by immemorial usage, which presuppo-
ses such original grant. Instances of abuse may have
occurred since, which are now supported in that way. The

case in *Dav. Rep.* is a mere *dictum* of the judges, as to the law in Ireland, and in the worst times of English jurisprudence. The other authorities cited by the plaintiff's counsel furnish cases of prescription only.

But we are told the king holds the public waters, not as a part of his prerogative, and unalienable, but as having the allodium of the soil of England on feudal principles. It is clear, however, that he holds by virtue of his prerogative. 2 *Black Com.* 39; 6 *Com. Dig. tit. Prerogative* 55, (*D*) 80. The queen of England is entitled to dower upon the demise of the king, and though an alien. 1 *Black. Com.* 223, 231. If navigable waters are not vested in him as the property of the nation, and under his prerogative, for public purposes, she would be entitled to dower in them. Free fishery is a franchise, or branch of the king's prerogative. 2 *Black Com.* If the king did not hold the soil itself by virtue of his prerogative, a right granted out of it could not be considered a franchise.

The feudal law was introduced by William the Conqueror. Admit that the Norman kings pretended to claim the sea and navigable rivers upon feudal principles, as their private property, yet the Saxon kings held it as a part of the prerogative; (*Bac. Abr. Prerogative B.* 3) and *Magna Charta* revived the Saxon doctrine and put an end to the Norman usurpation. If we were to admit that the kings of England, both before and since *Magna Charta* held the sea and navigable rivers as private transferable property; yet they held it subject to the common right of fishery, in the subject, which is a vested right, and may be pleaded. 1 *Pen. Rep.* 391; *Post* v. *Mun*, 1 *South.* 61; *Richardson* v. *the Mayor of Oxford*, 2 *H. Black.* 182; *Har. L. T.* 11, 19, 20; 4 *Term Rep.* 437. To destroy the vested legal right would be the highest effort of legislation. A king of England, upon the principles of the British constitution, cannot do it. In *Hargrave* it is admitted, that the king cannot, by alienation, destroy the *jus publicum*, and that

the common right of fishery is a part of the *jus publicum.* When he tells us, then, that the king may, by alienation, destroy this common right of fishery, it only proves that the author is inconsistent with himself. The construction put upon *Magna Charta,* in *Hargrave,* is opposed to all the authorities upon that subject above cited. It supposes the barons of Runnymede were anxious to put an end to royal encroachment, by prohibiting the subject from the right of fishing, and yet they left it in the power of the king to defeat their right at any time, and to any extent, by merely granting the soil to his favorites, an impotent effort which was unworthy of them.

Having ascertained the right and powers of the king over the navigable waters of England, it is easy to shew that he possessed the same rights and powers, and no others, over the public navigable waters of this country. England claimed North America by right of prior discovery. The soil, on the principles of the British law and constitution, vested in the king, and for the purpose of being parcelled out among his subjects. The English government could only hold it for the purpose of being settled. *Vattel* 99, *book* 1, *chap.* 18, *secs.* 207, 208. The people emigrating under the duke of York to America, brought with them all the laws and rights of Englishmen, except such as were rendered inapplicable by the change of their local situation. 1 *Bl. Com.* 107. If the king had retained immediate dominion over this country, instead of granting it to the duke of York, he would have transferred the soil to the inhabitants, who, of course, would take the same rights and interests in the adjacent navigable waters as in England. His having owned all the soil, would give the king no greater power over the navigable waters. Suppose a manor in England, through which a navigable river flows, should revert to the king, and he should parcel it out again to his subjects, they would take the same rights as before in the navigable waters.

It is said, the people migrating here brought with them political, but not municipal, rights; and that the provision on this subject, in *Magna Charta,* was merely local. On the contrary, they brought civil, as well as political, rights. *Constitution of N. J.; Smith's Hist. N. J.* 291; 8 *Cranch* 242; 1 *Mass. T. R.* 60, 61. Laws restraining the power of the king, more especially on navigable waters which supplied the inhabitants of a wilderness with food, were all important to them, and peculiarly applicable to their situation. But the king caused to be created proprietary governments here, by the grant to the duke of York. In the construction of this charter, we are to consider—1. What the king had a right to grant; and—2. What he intended to grant. 1. It is manifest he could give to the duke of York and his assigns, no greater right and power over the navigable waters here than he himself would have possessed; and, if the words of the grant are more extensive, all beyond his legitimate right is absolutely void. As he could only possess a right in these navigable waters, subject to the common right of fishery of the inhabitants, which was unalienable, the duke of York, and all claiming under him, would take the right of the king, subject to the same restriction; but—2. The king did not *intend* to grant to the duke and his assigns, as an *individual,* an exclusive right of fishery in these navigable waters. In the construction of this charter, we should consider it as a great state paper, not to be confined within the petty trammels of a mere private conveyance. The grant is not made to him as an individual, but as a qualified sovereign, created so by the same instrument, and thereby vested with a qualified sovereignty over the country. He puts the duke in his place, with his powers, and to hold the territory for the same purposes that he held it; the soil to be parcelled out among emigrants; the navigable waters to be used by those emigrants for navigation and fishing. He, therefore, gives the duke the soil and rivers, and all *royalties,* with the

*powers of government,* to be exercised according to the laws and statutes of the realm of England. Admitting, for a moment, the abstract power of the king to make an exclusive grant of fishery to an individual, in navigable waters, yet, in the present case, he granted to the duke of York, as sovereign over them, to hold them as he held them, with a common right of fishery in the settlers. The grant of the duke to Berkley and Carteret, and the subsequent grants, will receive the same construction. Hence, the people here always exercised a common right of fishery. 1 *Allinson's N. J. Laws* 57, *preamble; Leaming & Spicer,* 368, 369, 371, 129, *sec.* 6.

It is said, this was a conquered country : be it so. This would give the king no greater power over his British subjects ; he conquered with their arms. *Vattel* 391, *book* 3, *chap.* 13, *sec.* 202. *Smith's Hist. N. J.* 119. The country, however, was not conquered, but retaken from the Dutch.

It is said, in the grant to Lord Baltimore, (1 *Harris and M'Henry* 564) there is an express reservation of the right of fishery to the inhabitants of England and Ireland. It might have been doubted, whether the right of fishery would have extended to them, and was not confined to the inhabitants of Maryland. But why was there no reservation in favor of the latter ? Not, surely, because it was intended they should be deprived of it, but because it was clear they would have had a right, without a reservation in their favor. The interference is clearly in our favor, notwithstanding the opinion of Mr. Dulaney.

It is said, that all the ramparts of the people's rights are to be found in the concessions and fundamental constitutions, and that in the disputes before the surrender to Queen Anne, the people always appealed to them. It is manifest those provisions were merely precautionary, intended to operate upon the local government. If Charles had intended a despotism here, his grantee and his successors would have pursued the plan. See *Mr. Walsh's Appeal,* on that sub-

ject.   These provisions would have been nugatory if they
were not in pursuance of the original charter.   They could
not otherwise have bound the king, and, of course, would
not have been appealed to.   The duke of York and his suc-
cessors, the proprietors, having held these navigable waters
subject to the common right of the people, in the quality of
limited sovereigns, vested with the prerogatives of the king,
in the surrender to Queen Anne, gave back all their rights
and powers over those waters.   This surrender was made
because the proprietors had no right of government strictly.
*Leaming & Spicer* 613.   *Bac. Abr. tit. Courts Palatinate.*
That their rights over navigable waters were surrendered,
is proved—*First,* impliedly : because if the king, as already
shewn, could not make such grants to an individual for a
private purpose, the moment the great public object of the
grant ceased, which was the creation of a qualified local
government for the settlement and regulation of the country,
the rights over these waters reverted to the king.   *Secondly,*
by express words, they surrender all *powers, authorities,*
and *privileges* of and concerning the government.   *Leaming
& Spicer* 618.   *Privilege* is an appropriate technical term
to convey the idea of their *rights* under the *prerogative,*
and was so understood by the proprietors.   *Leaming &
Spicer* 590.   It is objected, that the proprietors, in their
previous negotiations, claimed all their rights in the sea.
So they make many other claims which were eventually
abandoned, and there would have been in the surrender a
reservation of the claim if it had not been abandoned.   If
these rights are not surrendered no other royalties are :
such as waifs, estrays, forfeitures, felons' goods, &c.   Yet
the queen understood they were surrendered.   (See her
instructions to Cornbury about forfeitures.   *Leaming &
Spicer* 627.)—But we now come to our second proposition.

Suppose these rights over navigable waters, which the pro-
prietors possessed, were not surrendered.   Suppose further,
that the king possessed, and the proprietors, while clothed

with the powers of government, possessed the right of destroying, by alienations of the soil to individuals, the common right of fishery of the people at large. Such a right would manifestly be a powerful act of sovereignty. It would be a strong high-handed exercise of *legitimate* arbitrary power against moral right, and not an exercise of power naturally and fairly inherent in the right possessed. When the proprietors, therefore, surrendered the government, if they retained their rights in the navigable waters subject to the common rights therein of the people, when they ceased to be clothed with the powers of government and sunk to the condition of common individuals, they could no longer exercise the high sovereign act of defeating the rights of the people in the navigable waters, but they and their alienees must hold them subject to such rights. It has been said, that whether the king had a right or not to grant these several exclusive fisheries in navigable rivers he did in fact grant them, and the proprietors have enjoyed them under the grant, and it is now too late to disturb them: I have already shewn that the king made no such grant; but if he had, and the proprietors had illegally enjoyed the possession under his grant, it would not avail them. *Stationers' Company* v. *Carnan,* 2 *Black. Rep.* 1004; 7 *Mod.* 108. It is notorious, that the proprietors have never exercised such a right, but the people have been in the constant immemorial practice of using all the public waters for fishing and taking oysters. It is said, that these oysters were planted by the plaintiff, and that he has a right to them though deposited in a public river, and that they are different from running fish. But there is no such distinction. *Pen. Reports* 391; *Richardson* v. *Mayor of Oxford,* 2 *H. Black.* 182. Besides, in the present case, the plaintiff threw his oysters on a natural oyster-bed, when the defendant unquestionably had a right to take oysters. The doctrine above contended for does not interfere with the fisheries on the Delaware, where the owners possess the exclusive right of haul upon the adjacent shores.

*Scott,* on same side.—It was incumbent on the plaintiff to shew a title. The possession of unenclosed premises is necessarily according to the right. Arnold never held adverse or exclusive possession, and the act of throwing oysters on the flat, so far from being considered an act of possession, has been adjudged by this court an abandonment of them to the common mass. 1 *Pen.* 391, 395. Possession, then, out of the question, we must return to the inquiry of title, and here the title to the farm adjacent does not aid the plaintiff, for that, in terms, excludes the place where the supposed trespass was committed. It therefore became necessary to shew a survey or conveyance to evince that the title was out of the council of proprietors, in conformity with the doctrine urged by the plaintiff himself.

He does not give or offer in evidence any conveyance or assurance from the proprietors; no common law title is offered, but he shews a survey bearing date 13th April, 1818. When it was recorded, does not appear; when it was inspected and approved, does not appear; that it ever was inspected and approved, does not appear. Inspection, approbation, &c., are substantive acts, and the subject matter of clear proof. The state (*Pat. N. J. Laws* 82, *sec.* 3) enacts, "that any survey made of any lands within either the eastern or western division of the proprietors of the state of New Jersey, and inspected and approved by the general proprietors or council of proprietors of such division, and, by their order or direction, entered upon record in the secretary's office of this state, or the surveyor-general's office of such division, shall, from and after such record is made, preclude and for ever bar such proprietors and their successors from any demand thereon, any plea of deficiency of right, or otherwise, notwithstanding." This survey is now produced under the operation of this statute, to excuse the non-production of a direct conveyance from the proprietors to the plaintiff in this cause. In the acknowledged absence of all conveyance from them, shall it be sufficient to make the

defendant liable, as a trespasser, to him who causes the survey to be made ? The survey is made wholly at the instance, and under the direction, of the party. It requires no warrant, and, in this case, had none accompanying it. Suppose a man to walk over unlocated lands between the time of a survey and the time of its being recorded, against whom does he trespass, the proprietors or that individual who has caused the survey to be made ? Is it certain that the survey will ever be recorded ? Many caveats interpose, and evince that it is unlawful to record. Many preferences are given by the statute, which the council are to decide. If we imagine conflicting surveys, we shall be brought to the conclusion, inevitably, that the *act* of the council is essential to the title. Inspecting, approving, and recording the survey are, by this law, in the absence of all ordinary and regular conveyance, made equal to the delivery of a deed, and the time of delivery, beyond all controversy, is the time when the title passes. To my mind it seems clear that this is the only rational construction of the statute. *From and after such record is made* the survey shall be operative, and it shall, from and after that time, *preclude and for ever bar*, &c.

But admitting, for the sake of argument, that a title, such as the proprietors could grant, was vested in the plaintiff, antecedent to the supposed trespass, we must proceed to examine what that title is. The plaintiff claims an exclusive fishery in and upon certain parts of the Raritan river, where the tide ebbs and flows. There is a natural oyster-bed there, and it is below low water mark. The defendant, Mundy, has taken oysters from this bed, and this is the supposed trespass. Our first proposition is, that the proprietors have no right to survey a navigable river, where the tide ebbs and flows, for the purpose of vesting private and exclusive rights therein in individuals. Our second proposition is, that the people have a vested right, *communis piscariæ* in such rivers, by the common law.

Our argument under the first of these heads is, that by prerogative, the king of England, in navigable rivers, has a

right of fishery, (not several nor exclusive) and that he has an exclusive right to royal fish ; that he has and holds these rights by prerogative only, as incident to the kingly office and sovereignty, and that, therefore, he cannot convey the sea, nor an arm of the sea, nor a navigable river, to a private individual for a private purpose. We place our argument on this broad basis, and insist that this is the doctrine of the common law, of civil law, and of national law.

The case of a cession from one sovereignty to another, as in the case of Louisiana, the Floridas, and the immense countries west of the Missouri, does not bear upon this subject. In the entire cession of the countries, the seas and the rivers, of course, go with the sovereignty. We insist that although between the ascent to the throne by William the Conqueror, whose title evinces that his crown was the crown of conquest, and *Magna Charta,* the king did actually grant out navigable rivers, exclusive fisheries, weirs in rivers, &c., yet it was contrary to common law and common right. The Norman succession considered England precisely as the counsel opposed to us consider this country, a conquered country. And they endeavored to impose that law on Englishmen, " the pleasure of the king," which we are now told was the law, the true and real law binding on our ancestors. The extortions and exactions of the followers and favorites of the Norman usurpation, far transcending their policy or their wisdom, finally roused the spirit of Englishmen. Their Saxon liberties were still remembered with the fondest recollection, and the barons, the nobles, the great men *et tota communitas Angliæ,* with one vigorous exertion of their strength, asserted the return of their ancient rights and laws, and, on the plains of Runnymede, received their acknowledgment in the first charter. They considered this charter as a great confirmation of many of their liberties ; as the restoration of many of the great principles of the common law ; as restraining the king from preventing the people of their rights and securing many important principles.

'*Magna Charta*, then, was the great fundamental law of England, binding alike on prince, noble and peasant; securing rights and prohibiting their infringment. This charter, cap. 16, declares—"No banks shall henceforth be fenced, but such as were in defence in the time of our grandfather, King Henry, by the same places and by the same bounds as they were accustomed in his time." Sir Edward Coke's comment on this statute (2 *Inst.* 30) explains it in a style so decisive that there is no escape. He says, "that is no owner of the banks of rivers shall so appropriate or keep the rivers several to him, to defend or bar others, either to have passage or fish there, otherwise than they were used in the reign of King Henry II.". See also cap. 23 of *Magna Charta.* To the same effect is 2 *Black. Com.* 39; and in *Salk.* 357 and 6 *Mod.* 73, we have the decision of that great constitutional Judge Holt, that the king's grant cannot bar a subject from fishing in a navigable river. In 2 *Sul. Feud. Law* 241, 1 *Reeve* 234, *Willes* 265, 2 *Bos. Pul.* 472, 1 *Camp.* 312, we have the same doctrines and principles quoted and remarked on with high approbation; and that these principles are not peculiar to the law of England, but are co-extensive with civilization and the government of law we have but to turn to *Coop. Justin.* 67, 1 *Vattel* 11, 117, and 2 *Domat.* 399. The answer to this is not satisfactory to my mind. It is, that the king had the right of soil, and could grant it, and that with the grant of the soil, and as incident thereto, the fishery must go. It is fairly admitted that the king has the right of soil in navigable rivers, as a royalty as incident to, and inseparable from, his character of sovereign, but it by no means follows, that he may alien that which he holds *quasi* in trust for the subject.

Unusual pains and industry have produced against us the case reported in *Davies* 150, and Sir Matthew Hale's treatise in *Har. L. T.* The case in *Davies* was decided in Ireland, in the reign of James I., when the royal prerogative was at the highest; when the *jus divinum* was every-

where taught, believed and ruled ; and when contest with
the kingly power, in defence of the subject's right, was
esteemed the madness of folly. Nevertheless, there is noth-
ing there decided at war with the great principles for which
we contend. It is said that every river where the tide ebbs
is a royal river, and that the fishery is a royal fishery, and
belongs to the king by prerogative ; and that he shall have
exclusive right of royal fish. Let me ask, why is the phrase
*exclusive* applied to royal fish if he has the right of exclud-
ing the subject from other fish ?

The sole object intended by citing Sir Matthew Hale's
treatise was to prove that there actually were, and are to
this day, in England, several and exclusive fisheries in navi-
gable rivers. *Magna Charta* acknowledged it hundreds of
years ago, but enacted that none should continue, except
such as were in use in the lifetime. *Henrici regis avi nostri
et per eadem loca et eosdem terminos.* I understand this
great man as inquiring into the titles of exclusive fishery,
and the result is, there are two. 1. Grant. 2. Prescription
of immemorial use, which implies a grant. The times or the
dates of these grants had not become the question in discus-
sion, and, besides, many grants of several fishery might have
emanated from the crown, such as had been acquired by for-
feiture, escheat, or in a variety of ways. I ask for the evi-
dence, that the king may now create a new several of fishery.
It is that alone which is prohibited by *Magna Charta.* Lord
Hale certainly produces no instance of a modern grant, none
so late as the reign of King John.

I think the conclusion therefore obvious, that the kings of
England are, by the policy of the law, the owners of the
beds of navigable rivers, yet that it is a qualified ownership,
and such as that they cannot part with for private purposes,
but must hold them *quasi* in trust for the subject. The
grant from King Charles II. to the duke of York was, I
think, founded on these principles. The conveyance was of
New York and New Jersey, with power of government, and

reserving an appeal to the king in council. He entered to make the duke of York a sub-sovereign; he conveyed the lands to him as a subject, and the royalties as a sovereign. He understood well that these navigable rivers belonged to the sovereignty. They continued in the sovereign still, for he alone could hold them, as trustee, for the subject's use.

It is a little remarkable how mere a self-murder the argument of our opposing counsel is, when applied to the fisheries in the Delaware river. In the conveyance from the duke of York to Carteret and Berkley, the western extremity is the eastern margin of the Delaware. The river Delaware was not conveyed to them, that remained in sovereignty; and now we are told, that the divisional line of this state extends westward only to the east margin of the Delaware. It does not extend an inch into the river; and yet many men, from owning the adjacent soil, are the owners of valuable fisheries. Examine this position one moment. The boundary of the state is the east margin of the river, and yet there are fisheries appurtenant, out of the state, to invade which would be a trespass, and *clausum fregit* would lie.

I deny every word of this doctrine. The State of New Jersey, as a free and sovereign state, extends *usque ad medium filum aquœ*, east and west. In the character and capacity of proprietors, Carteret and Berkley took neither the Hudson nor the Delaware. So far forth as sovereignty was created, and no farther, were these great navigable rivers given; the land only was given, and rivers not navigable, the only lawful objects of property.

When New Jersey and Pennsylvania became free and sovereign, the Delaware rolled between them, and, *ipso facto*, the centre of that river became the division line, until a mutual convention between them settled their boundary; and such, we are sure, was their apprehension of the matter, for, by treaty, they divided the river and the islands within it. In like manner is the divisional line with New York ultimately to be settled. Precisely the reasoning urged

Arnold *v.* Mundy.

against us would bring the jurisdiction of New York to high water mark on the Jersey shore. New York answers to our claims, and reasons just as the council of proprietors do here. The whole of the two states was given to the duke of York; what was not sold off remains to us. New Jersey, by special metes, was sold off, and you are to take this strict measure? Not so. The great river Hudson vested and remained in the sovereignty till the declaration of independence; it then became a great natural boundary, and vested in the sovereignties of the two states, and the middle is the proper boundary until treaty shall establish another.

The result seems to me to be conclusively this, that the sovereign has allodium of the soil of the sea and its arms; a right of fishery, *quasi* in trust for all the citizens and subjects; that he has the exclusive right to royal fish; that fishery and navigation are co-extensive; the subject in a limited government, and the citizen in a free republic have, in my mind, the undoubted *communem piscariam* and the right of navigation. The king's prerogative in England may be, and often is, one of the subject's rights; the sea is *res communis*. In relation to newly discovered countries, our original proposition seems to me unimpaired. The soil and the rivers are a great national domain. The country must be inhabited, or the king loses his right; and when inhabited, the people carry with them the same rights and privileges they had in the mother country. I said, before, that fishery and navigation were co-extensive.

If King Charles II. could grant, and did grant, all of New Jersey, all the rivers, &c., for private purposes; if there was no public law to restrain him in the use; if his assignees stand in *pari ratione;* and if, under this conveyance, now after the bond of union between this country and England is severed for ever, the assignees, the lords proprietors, can assert the right and exercise it too, of parcelling out exclusive fisheries in the navigable rivers; if their claim be just and lawful, *viz:* that the whole was theirs, and what is not

sold still remains to them, I ask, what is to prevent their taxing navigation and commerce? Every sloop that sails commits a trespass. This controversy about the oysters is but the entering wedge; the shad fisheries and the navigation come next; and the same process of reasoning which will justify the one, in like manner will establish the other.

Their title to the rivers, we are told, was not a public title for public use, in which all the citizens had an interest, but it was a private individual interest of their own, the subject of sale for money. It is a plain and direct assertion, that fisheries, navigation and bridges belong exclusively to them.

I have taken no notice of the conveyance of sovereignty to the lords proprietors; it is not here necessary to discuss that. The decision in the reign of Queen Anne was, that they could not lawfully exercise jurisdiction and government, and the surrender of the government to her was founded on that decision. But if the government did pass by the grant of the duke of York to Carteret and Berkley, and if their assigns could, and did, take the government by virtue of their grant, it is clear that they took the royalties therein mentioned, *rivers, bays, ports, coasts of the sea,* &c., in the character of sovereignty, as that common property of the nation, the nominal ownership of which is ascribed to the sovereign, but which is held in trust, and of which all have a common right to partake. The surrender to Queen Anne restored all these royalties to the crown of England, if they ever were separated. It follows, that upon the Revolution, when the people of New Jersey became free, *sovereign* and independent, all these royalties vested in them the legal title and the use existing in the same; and that the legislature of this state never having given any exclusive right or title to the plaintiff, he is without right or title, and was, therefore, properly called at the trial.

*R. Stockton,* in reply, after stating the case from the record generally, said—This non-suit, if supported, would

be of serious import to an important species of property which had been claimed and enjoyed from the first settlement of New Jersey; it struck at the root of all title of several fishery in navigable rivers in the State of New Jersey, a property all important to numerous respectable families located on those rivers, and enjoyed uninterruptedly until this defence had called it into question.

The plaintiff's complaint was for breaking his close covered with water and taking away planted oysters. To sustain his suit, it was incumbent on him to prove—1. That he had title and possession of the *locus in quo.* 2. That the oysters were his. 3. That the defendant entered and took them. These points being established, it would rest with the defendant to shew that he had a right to enter and do what he did. The place where, &c., was a mud flat on the river Raritan, opposite the farm of the plaintiff, the greater part between high and low water mark, all between the land and the channel of the river, and being of no kind of benefit to, and utterly unfit for, navigation.

To this ground the plaintiff sets up his titles. 1. By the common law, as being a mud flat between a navigable river and the plaintiff's farm, bounded by the river, and being immediately opposite to his farm. 2. By a proprietary survey, made prior to the trespass, by which the whole premises were conveyed to him by the proprietors, which would operate either as a new grant, or a confirmation, according as it might be necessary to apply it to the subject matter.

I. As to his title to the flat, as opposite and adjoining his main farm. It is true, that at the common law, this right seems to be restricted to high water mark, in the case of navigable or public rivers, but extends to the channel, or *ad filum aquæ,* in private rivers, or those not navigable. It might be contended, with much reliance, that all the rivers included within the conveyance from Charles II. to the duke of York ceased to be public, and were made private rivers

by the conveyance to the duke, he being then a subject, and the property being a country wild and uninhabited, except by savage tribes.

Upon this ground, perhaps, it is that *Swift* in his *System*, vol. I. 343, lays down the general proposition "that in navigable rivers, every proprietor of land is deemed to have the exclusive right in rivers and seas adjoining his land to the channel;" and he adds, "that no person may take oysters or any shell-fish from their beds in front of another's land, or draw a seine for other fish, though he does not for that purpose enter upon the land of the adjoining proprietor." It is also a notorious fact, that in the discussion which took place some years ago between the commissioners of this state and New York, our commissioners defended our claim to the channel of the Hudson upon the ground, that to all purposes, but that of navigation, that river must be considered as a private river. *Rep. of Com.* 14, 15. This report was made to the legislature; their proceedings approved, and their argument published under the sanction of the legislature.

II. But it is unnecessary to press this point, because we gave in evidence a survey and location of the oyster-bed, regularly made, in virtue of a proprietary right, before the trespass complained of. One of the adverse counsel has taken an exception to this title in *limine*, that although "this survey and location was made *prior*, yet it was *recorded* after the trespass, as if the title was founded on the record, or even the approbation by the counsel of the proprietors, and not on the actual survey and location." I shall not stop to answer this objection. The Chief Justice, in his opinion, has fully and ably disposed of it; his reasoning on that point needs no aid from the bar; it will take care of itself, and there it will be left by me.

The general question then is, whether these mud flats did not pass in full propriety to the plaintiff, either by his title to the main farm, or by this particular survey? If the title

to this flat ever was in the proprietors, it certainly has passed to us. That it was in the proprietors, no court of justice in New Jersey is at liberty to deny. This title has the same foundation upon which rests all title to real estate here; it is simple and conclusive. Charles II. claiming and in possession of the whole, conveys to the duke of York a much greater territory. The terms of the grant are as extensive as the English language affords, and as English lawyers could put into a conveyance. It conveys " all the lands, soils, rivers, waters, harbors, fishings, fowlings, royalties, profits, commodities, and appurtenances in fee simple, together with the powers of government, with the exceptions, that he holds of the king by the tenure of free socage, and that his laws shall be assimilated, as near as may be, to the laws of England. The duke conveys, in the very same terms, to Carteret and Berkley; and all their rights have been transmitted, by mesne conveyances, to the present proprietors. They purchased not only the soil and waters, but the government also, and were the lords, legislators, and owners of the territory, as fully as the duke had been. Who, then, can doubt but that as all our title to land must be deduced from this grant, so, according to the terms used and the intent of both parties, it did pass, not only the fast land, but also all those parts of the sea shore, bays, and rivers not considered as part of the fast land, which a king of England acquiring title to a new and uninhabited country would legally grant and convey. It is admitted on all hands, that the fast land to high water mark passed; and it has been, and will be, abundantly shewn, that the rest, *to wit,* the shore between high and low water mark, the flats, bays, rivers, and waters, from the sea to high water mark, passed.

Now, without going at present into the question of general right to several fishery incidental to, and inseparably attached, as we think it is, to the right of soil, may we not say, that the plaintiff's evidence sustained his case, and that

he ought not to have been non-suited. We shew that the land was ours; that the plaintiff purchased the oysters; planted them on his own ground; staked that ground off, but not so as to interfere either with the right of taking swimming fish or of free navigation. Thus did the plaintiff purchase, and plant on his own soil, the fry of shell-fish taken from distant natural beds, with intent to improve them; but the defendant entered his close, with tongs took the oysters out of the very soil, and converted them to his own use. Did not these oysters belong to the plaintiff? The original foundation *of all* personal property is appropriation at the expense, and by the labor, of the claimant. 2 *Black. Com.* 9, 391. In respect to animals called in law *feræ naturæ,* which can, when in a state of nature, have no particular owner, it is emphatically so. Deer put into a park, rabbits in a warren, fish in a pond, become private property by caption and detention. The case of oysters planted on a man's own soil is at least as strong. The plaintiff's case includes in it every principle of original acquisition, the payment of the purchase money, made the fry the property of plaintiff; the labor in planting them; the deposit on his own land; constituted each a good foundation of exclusive property; nor could such an act of planting, though in the water, amount *to an abandonment.* Such was not the intention nor tendency of the act; but the very reverse was intended when he planted them in his own soil and put up public visible marks, distinguishing them from all others. If, then, such be the foundation of all property; if exclusive right to the fish that swim, the deer that bound, and to the bird that flies, may be acquired by appropriation, why shall he not have in the oysters which he has purchased with his money, planted by his labor, and deposited on *his own soil,* from which they never can depart of themselves, the same rights? What is the answer of the adverse counsel? It is that this oyster-bed is located in a navigable river, where the tide

ebbs and flows, the defendant had a common right to fish there, and, therefore, his entry and taking away the oysters was lawful.

Waiving, at present, the position I shall hereafter endeavor to maintain, that the plaintiff has shewn full title to a several fishery on this ground, for all kinds of fish ; I shall here deny that there was any common right *to take these fish.* The common right, where it exists, is confined to fish in their natural state, swimming, if they are floating fish, and if they are shell-fish, in a state of nature where they are spawned. It is clear that at common law, the owner of a river might make a weir across it, if it did not injure the navigation, because it was his own, and such a weir, *per se,* made a several fishery. *Har. L. T.* 18, 22, 23. 4 *Mass. Rep.* 527. Now here is a grant of the land itself, laid in front of the plaintiff's farm, of moderate and reasonable extent, not at all impeding or injuring the navigation, appropriating only a mud flat, planted with small fry at private expense ; how, upon any sound principle, can a pretended common right to fish authorize an individual, against the will of the owner, forcibly to enter and carry them off ? What is a common of fishery ? It is a mere privilege or franchise ; it is no title to the land or fish ; a mere privilege to take fish, and must be used reasonably ; to extend it further than to take fish in their natural state, is unjust and unreasonable, and therefore unlawful. It would permit what the law reprobates, the taking the property of another without compensation. To support it is little better than to authorize plunder, whatever fine names it may go by. No case can be shewn, justifying the taking of fish out of a pool, pond, or weir in a navigable river, under pretence of the common right. The only question in such cases is, whether the pond, pool, or weir is a nuisance to the navigation ? It is said that on this ground there were some oysters naturally bred. Suppose there were, did this authorize the defendant to take those which the plaintiff had planted

there? It was incumbent on the defendant to have shewn in evidence, that those he took were natural oysters. He made no pretence of this; on the contrary, it is stated by the report of the Chief Justice, that he took the oysters planted by the plaintiff.

Again—it was said that mixing them with the natural oysters destroyed our property. Not so. There was no evidence that the rows of planted oysters could not be distinguished from the natural. The defendant had sufficient ground left upon which to exercise his right. The owner of the soil has a right to fence in if he leaves enough for common use. 2 *Bac.* 392. The court, instead of non-suiting the plaintiff, should have put it to the jury to decide whether the oysters taken were those planted? whether they could be distinguished from the natural oysters? and whether there was not common enough left by the plaintiff unenclosed? If we are owners of the soil, the defendant had no right to enter and take the oysters from the soil; our act in planting and appropriating amounted only to a surcharge of the common. In such case the commoner is put to his action. The case of *Cooper* y. *Marshall* (1 *Bur.* 259) is full in point. In England, the right of property in oyster-beds in navigable rivers is acknowledged as existing at common law, and is protected by penal statutes. 3 *Chitty's Crown Law* 359. By the statute 31 George III., chap. 51, the taking oysters from such beds is made a misdemeanor. 3 *Chitty's Crown Law* 359. By the 48 George III., chap. 144, it is made felony; yet there is no prior statute making such beds in navigable rivers the subject of private property. By these statutes, the legislature recognize oyster-beds and the oysters there planted as private property, and protect it by making the spoliation thereof an indictable offence. 5 *Esp. Rep.* 62. 1 *Camp.* 309. In the cases which have occurred under these statutes, this idea of common right to take oysters has never been set up as a justification of the offence; but the distinction between floating

fish in a state of nature, and oysters in a bed, is recognized. In the case of the *State* v. *Capt. Lewis,* who was indicted for an assault upon these same Woodbridge men, in defending his oyster-bed adjoining the premises, tried at the Court of Oyer and Terminer of Middlesex county a few years ago, he was defended on his right of property to the bed and the oysters which he had planted; and although the assault was by presenting a loaded pistol, attended by a threat of inflicting death if the trespassers did not desist, and was fully proved, yet the defendant was acquitted by the jury on the charge of the Chief Justice, that Capt. Lewis had a right to defend his property, and that what he did, did not exceed the bounds of defence. This case, compared with the present, affords a strong instance of discrepancy in judicial opinions. One citizen loads his pistol, takes the field and drives off the plunderers, acting, as they did, on this same pretence of common right; another citizen, not so adventurous, submits peaceably, appeals to the law of the land, and is non-suited by the same respectable judge by whose direction the other had been acquitted!

The principles of private right and of public convenience require that this species of property should be protected. The oysters on the open beds are nearly exhausted; the rakers have become so numerous that oysters are not permitted to attain any maturity; they are small and worthless—hence the price of those fit for use is greatly enhanced; but if this reasonable use of a man's own soil is permitted and protected, every land owner on the shores of our bays and salt rivers will have an oyster-bed; the quantity brought into market will bring down the price, so that the poor as well as rich may eat and be glad.

The only other case which has occurred in New Jersey was cited from 1 *Pen.* 391, by the adverse counsel. But in that case the planter of the oysters had no pretence of right of soil; he was not the owner of the adjoining farm, nor had he made any location of the premises; he was merely a way-

faring man, who dropt his oysters in a navigable river. At the time when that case was decided it seemed quite clear, from the anxiety manifested by the judges to protect planted oysters, that if he had been owner of the soil he would have been successful.

II. General point.—But not to rest on this particular case, as forming an exception to a general rule, I shall follow the adverse counsel through the great point which they have labored, and, notwithstanding the learned arguments we have heard, I submit it, that our claim to a *several fishery* has been fully sustained. The adverse counsel yield to us some of our ground. They seemed to admit that these rivers, bays and waters, with the land they cover, are the subjects of exclusive property, and that by the law of England the king is the general owner.

The points debated are—1. Could the king lawfully grant a right of several fishery in a navigable river? and did he grant such a right to the duke of York, and he to the proprietors? 2. If he could, and such right did originally pass, was it surrendered by the proprietors to Queen Anne?

1. The right of the king of England to make such a grant is denied by the defendant's counsel. But it has already been shewn—1. That, by the *common law*, the king had such a right. 2. That there was *no statute* of England which prohibited the king from making such a grant *of lands in New Jersey*.

1. Charles II. as king of England, was owner of New Jersey. His title was such as was recognized by all civilized nations, *discovery* of a new and before unknown territory inhabited by savages—*conquest* from the Indians and Dutch; these were the foundations of his right. We have an authentic history of these transactions. The English first discovered and took possession of this part of North America. Being at war with the states of Holland, they were driven out by their enemy, who took possession and built the city of New York, then called New Amsterdam. They extended

their settlements into New Jersey, particularly into the adjacent counties of Bergen, Essex, Monmouth, Somerset and Middlesex, the first inhabitants of which were generally Hollanders. But in 1664, the English re-conquered the territory and expelled the Dutch government. The king thus gained a new title, by *conquest* over a civilized owner. His grantee, the duke of York, took complete possession, and the whole landed property of New Jersey is held immediately from the king of England. He held it not merely in point of jurisdiction, but also in ownership. It was unappropriated land, a savage wilderness, a great waste. To such property the law appoints the king as owner, because there is no other. Moreover, it is a fundamental principle of the common law, that *all lands*, even those of private men, are held of the king. Where there is no private owner, therefore, all persons *must* claim title through him. 2 *Black. Com.* 49, 50. In respect to the old settled and granted lands in England this may be a fiction of law, but it is truth and history here. It was a newly discovered wilderness, conquered by the king of England; it was his from necessity, and belonged to him solely, substantially and beneficially. Thus, being the lord and owner of the land, shores, rivers, bays and waters, he conveys to the duke of York as fully and amply as he held them, except only that *his* title *was allodial, the duke's feudal,* in free and common socage. Not only does he convey the full propriety, but to make it more full, and as extensive as possible, he grants also the powers of government. The duke conveys to Berkley and Carteret, and they to the proprietors, as fully and extensively as the same were conveyed to the duke. This was a solemn deliberate act, well considered at the time, and intended to convey all which the granting words imply. It was twice conveyed, the first grants were in 1664, but at the date of the first grant to the duke, the Dutch were in possession, but they were expelled the same year. Ten years afterwards, doubts being enter-

tained whether the re-conquest did not give the king a new title, notwithstanding his grant of 1664, he, in 1674, made a second grant to the duke, and he to the proprietors, in the same terms with the first. Then, *to wit :* in July, 1676, followed the deed of partition, commonly called the *quinti parte* deed, by which East Jersey is assigned to Carteret, and West Jersey to Berkley; and afterwards, in 1682, the trustees of Carteret convey East Jersey to the twelve proprietors, under whom the present proprietors claim. All these *mesne* conveyances adopt the words of the original grant in *extenso,* constituting the proprietors as fully owners and governors as the duke, or even the king himself had been, saving only their allegiance to the British crown. Under this title did the proprietors take possession as owners and rulers. They appointed their governor, made their constitutions, granted lands, and did everything which pertained to full and absolute ownership and dominion. This title, and the proceedings of the proprietors under it, were repeatedly confirmed by the English monarchs, nor were their powers ever questioned until a short time before the surrender of the government to Queen Anne, and then nothing further was questioned than the grant of the important powers of political government. Was all this delusion? Had the grantees really no beneficial interest? Were they trustees for the expected settlers, or the true owners and proprietors of everything included legally in the forms of the grants? Let every landholder, every owner of several fishery, from Hackensack to Cape May, look well to the answer given to these questions, all our titles depend upon it; the answer of law, liberty and justice at this time of day is, that all which the grants purport to grant, were legally and effectually granted.

By the common law, the king is the owner of all navigable rivers, bays and shores below low water mark, and he owns them, not as trustee, but in full dominion and

propriety. *Davies* 152 *to* 155 ; 6 *Com. Dig. tit. Preroga-tive* 55 (*D* 50) ; 5 *ib. Navigation* (*A*) 102 ; *Har. L. T.* 10, 11. He has as full a right to grant and convey, at the common law, as a private man has to convey his farm, and this law has annexed to this right but two limitations. 1. That these waters shall remain highways for passage and navigation. 2. That while they remain ungranted there is a common right of fishery therein. The cases cited fully prove, that in places over which the tide ebbs and flows, between high and low water mark (seaward) the king, by the common law, has not only *the jurisdiction* but *the property*. This was the law as understood by Lord Hale, a most learned judge, not inclined to stretch the rights of the crown, and that even in regard to the waters, seas and rivers *within the English dominions*. How much stronger is the case here, as to waters washing a newly-acquired territory uninhabited only by the savage tribes, and acquired by conquest. That the king, as owner, may grant to an individual a several fishery in a navigable river, is the received common law of England. 5 *Com. Dig. Navigation B*, 102 ; *Har. L. T.* 17, 18, 19, 22, 23 ; *ib.* 34–5, particularly the case of *Crow* v. *Johnson*. These authorities are express to the point, and need no comment. Neither Lord Hale nor Chief Baron Comyns understood the rule of the common law to be what the counsel contend for. What answer is given to these cases ? The adverse counsel say, that they refer to old grants made by the kings of England, by usurpation, before the passing the celebrated statute of *Magna Charta ;* that such grants are prohibited by this statute, and, therefore, the grant was void as to the right of fishery. This position of the defendant's counsel is not founded in law. Have we not proved that the king is owner by the common law ? Shall he then, of all owners, be the only one who cannot grant all that belonged to him ? This is in truth reversing the most fundamental principle of the English law, which

gives to the king, by his prerogative, more ample powers than any subject can possess. Lord Hale makes no such distinction. He wrote in the reign of this same king, two centuries after *Magna Charta,* and he considers it *then* as perfectly clear that the king might lawfully grant these exclusive water rights.

If such grants were considered usurpations, why were they not annulled by course of law? Would so great and learned a lawyer as Hale have treated them with such respect, if they were all unlawful by the common law? The gentlemen are obliged to concede, that an individual may claim a several fishery in a navigable river *by prescription.* This concession admits the legal power of the king to grant, for it is a first rule of this branch of the law, that nothing can *be prescribed* for which could *not be granted.* Prescription presupposes a grant, which from length of time cannot be shewn. 7 *Coke's Rep.* 18; 2 *Black. Com.* 264. When, therefore, modern judges and writers agree that you *may prescribe* for a several fishery, they do admit that if the grant could be shewn it would be good, for prescription means usage, time out of mind, founded on original grant.

The true rule has not been given to us by the adverse counsel; it is this, that *prima facie* fishery in a navigable river is common. He who sets up an exclusive right must shew title *by either grant or prescription,* presumed by the law to be founded on grant. Indeed, if ownership of the soil is essential to a right of *several* fishery, it does not seem strictly correct to say, that you may make title to it by prescription, for soil cannot pass by prescription. It is more accurate to say, that by prescription a right of common fishery may be destroyed. That the plaintiff's right to several fishery may be established by grant, and the defendant's *prima facie* right of common destroyed by it is fully proved. Chief Baron Comyns says, " So a man *by grant or prescription* may have several fishery in a navigable river. 6 *Com. Dig.* 56. This is his own position; he afterwards

cites the case of *Warren* v. *Matthews*, cited against us as being contra, *in his manner, when he thinks the case is not law.*

Lord Mansfield gives the same rule as laid down by Comyns. 4 *Bur.* 2164. And Justice Yates says, in express terms, that several fishery passes *by grant or prescription.* We have then the authority of such great men as Hale, Comyns, Mansfield and Yates, to prove that, by the common law, a right of several fishery may be granted. That the words of these grants do convey a several fishery, if by law it may be conveyed, has been fully demonstrated by the opening counsel. It passes by a grant of the soil, which is as well of the water over the soil as of the soil under the water. *Har. L. T.* 17, 19 ; 5 *Bur.* 2814 ; *Davies* 180–1. It has never been doubted but that a conveyance of the soil passes fishery. The doubt has been, whether there could be a right of several fishery without the soil, (*Doug.* 56) and the modern opinion seems to be that there cannot. A right of several fishery is not a mere appurtenance to the land, but the land itself, and, therefore, when the land passes so must the fishery. Hence Lord Hale and Chief Justice Parsons say, that making a weir rightfully makes a several fishery. So, by a grant of all waters, several fishery passes. In our case the grants are drawn with an evident intent to pass all which the king could grant, either as land or as water. Then if the king, by the common law, was competent to grant, and did grant, a right of several fishery, the remaining question is, whether this right was taken away by statute ?

III. The celebrated *Magna Charta* is relied on, or rather two sections of that statute, *to wit,* the 16th and 23d, and when the words of these sections are read it is no small tax upon the gravity of argument to discuss its application to the present case.

*16th Section, Statute at large*—"No banks shall be defended but such as were in defence in the time of King Henry our

grandfather." The counsel for the defendant asserts, that this section prohibited Charles II. from granting to the duke of York the waters of New Jersey. Who·can forbear a smile? What banks are meant, the banks of the Hudson, Raritan, Delaware, Potomac, or Mississippi? What did "our grandfather King Henry" know about them? The banks intended by the parliament are those of the great navigable waters of England; it is local in its provision on its very face. How "defended" by sticking poles of·willow whips in a mud flat, over which the smallest boat at high water can glide, to mark out an oyster-bed at Amboy! Is this the "defence" which that statute was intended to put down? No! the famous barons who extorted that statute from John, spoke of those artificial banks or mounds raised in navigable rivers in England, by which not only the natural passage of the fish was stopped but also the navigation interrupted. This sixteenth section was so illy penned and useless, and the object so much better attained by subsequent statutes, that even when *Bracton* wrote it was ,considered *out of use* in England. 2 *Inst.* 30. And Judge Blackstone, in his tracts, analyzing this famous statute, does not even give us either of these sections.

23*d Section, Statute at large* 6—"All weirs shall be utterly put down by Thames and Medway and through all England, except on the sea coast." This in its terms is local, confined to the realm of England; and what does it enact even there? What is a weir? It is a dam across a river. But did it mean, even there, that there should be neither dam nor stake stuck in the mud in any mud flat in England? It meant simply to prohibit nuisances. If the weir did no injury it was not within the purview or intent of the statute. For this exposition we give the authority of . Coke and Hale, and the parliament of England. *Har. L. T.* 9. Hale, after giving the words of this section of the statute, says it was meant to restrain nuisances, and "these nuisances were such as *hindered the passage of boats.*" *Ib.*

22. Again—commenting on this and some subsequent statutes, Lord Hale says, " and by force of these statutes, weirs *that were prejudicial* to the passage of vessels were to be pulled down. *But that did no way disaffirm the property, but only remove the annoyance.*"

The statutes 25 Edward III. chap. 4, and 1 Henry IV. chap. 12, were passed to amend and explain these senseless sections ; (1 *Statute at large* 260. *Ib.* 429) and Lord Coke, in commenting on them all, says " the generality of the words of the 23d section of *Magna Charta* are corrected and restricted, by the two subsequent statutes, *to such erections as were nuisances.*" 13 *Coke* 35.

In 3 *Bur.* 1768, we find a case of several fishery in the river Thames, and the court say upon this subject, " that a man *may do anything with his own which is not a nuisance.*" Here we have a sensible practical explanation of these old English statutes, and it becomes useless to inquire whether any part of the local prohibitory provisions of the statute law of the mother country applied to this new acquisition ? There was much crude opinion in England on the general question of the statute law extending here. Lord Holt, the great whig Chief Justice of England, on whose sole authority the general point of the adverse counsel rests, says, " the law of England does not extend to Virginia ; her law is what the king pleases." *Salk.* 666. He probably meant the statute law of England, and perhaps he was right so far, speaking as an English judge. The doctrine of the colonists here was, that so much *of the statute law as suited their condition* was brought over, as well as the common law ; and further, they undertook to say what did suit them. But the first proprietors and settlers did not repose themselves upon the statutes of England for their rights and liberties, but took care to grant on the one side and secure on the other, in what is called the grants and concessions, all the great principles of English liberty. The great political clauses of *Magna Charta,* particularly the 29th section,

which is the bill of rights of the people of England, is
adopted word for word, and incorporated into the grants
and concessions. These grants and concessions do in fact
exhibit an original contract between the people and their
rulers, a complete free written constitution. The venerable
ancestors of the people of New Jersey have the uncommon
honor of having first reduced to practice the theory of origi-
nal contract between the governor and the people, and of
presenting to the world the *first* written constitution which
effectually secured the religious and civil liberty of the
settlers. They wanted not the protection of English statutes,
finally to be construed and applied, or not, by English
judges. They demanded and received a constitution of
their own, securing to them and their children all the bene-
fits of a free government. And yet the learned counsel
accuse us of advancing and advocating slavish principles,
because we insist that these miserable samples of rude legis-
lation contained in the above sections of an English statute,
speaking of our grandfather Henry, and of the Thames and
Medway, ought to be excluded from all operation *now* in
New Jersey. There is nothing, then, in the statutes relied
on interfering with our title, and the question recurs, might
not the king, by the common law, grant the soil, and with it
several fishery in the colony of New Jersey?

The *dictum* of Judge Blackstone is relied on. 2 *Black.
Com.* 39. He is the first elementary writer who denies
to the king the power of granting since the statute of
*Magna Charta,* but this part of the great work was
reviewed by the learned author after Mr. Hargrave's obser-
vations upon his doctrine of fishery, and is now carefully
penned, and is expressly confined to a grant by the king of
the *franchise of free fishery.* He does not say, that the king
could not grant the soil of a river, and, of course, *several
fishery* as part of that soil. The distinction between several
and free fishery, in respect of such grants, is palpable and
obvious. The right of *free fishery* is an exclusive right to

take fish in a navigable river *not granted away*, but belonging to the king by his prerogative. In the king's hands, the common right of taking fish in all the people attaches to it, and he may now grant to a favorite an exclusive right, and yet remain owner *jure coronœ*, for while the property is in him, such exclusive right is in derogation of the common right of the subject. But if the king grants the soil, the presumption of law is, that he grants it for good reasons, and that no prejudice will flow from it, and it immediately becomes the freehold of the party. The grantee holds it subject to the *jus publicum*, (which is not the common right of fishery) and must take care that he erects no nuisance; but under this limitation it is as much his as the fast land, and he cannot be deprived of it without injustice.

2 *Cruise* 297, also cited against us, follows Blackstone, uses his cautious language, and confines the restriction to the franchise of *free fishery*. It is true that Lord Holt, in the case of *Warren* v. *Matthews*, before alluded to, as reported in 6 *Mod.* 73, cited against us, is made to say, that there can be no several fishery in a navigable river. As it stands in the book, it is a mere *dictum*. What the particulars of the case were does not appear, and the general position is not considered as law by Hale, Comyns, Mansfield, and Yates.

It is asserted by the adverse counsel, that the old grants of several fishery were usurpations contrary to the common law. No case has been, or can be, shewn to warrant that assertion. The common law seems admitted to be in favor of the power of the king by all the old writers. The only question made has been, whether he was not restrained by statute? We have shewn what that restraint is, and that it is nothing more than a restraint *against authorizing a nuisance.*

Again—it is said, that although the king may be the owner of this sort of property, by the common law, yet he is not so to every intent; that he holds the *jure coronœ* as a

trustee for the people, and, therefore, cannot convey to their prejudice. It is likened to the other dominions of the crown, which they assert he has no power to alienate; and they run a distinction between what the king has as king, in virtue of his prerogative, and what he holds in his own right, as private property. For example, they say that he claims the sea, bays, rivers, and shores by his pre-rogative, for his people, and, therefore, may not grant to their prejudice. But lands which accrue by escheat or forfeiture, say they, are his own, and he may grant them to whom he pleases. There is no kind of solidity, either in the reasoning or the distinction. At the common law the king is not, as to his lands, a trustee for the people, and might alien the domains of the crown. 3 *Cruise* 14, *sec.* 5; 4 *Statute at large* 88. He had the same, nay a greater, power to grant than a private man. He was never restrained until after the revolution of 1688, by the statute of Anne, (3 *Cru.* 565) which is confined to his lands in England, and was passed long after our title accrued, and that statute permits the alienation for thirty-three years.

By the common law, all the king's lands belong to him *jure coronæ.* 6 *Com. Dig.* 61 (*D* 63). His natural character is merged in his political; he can, in his own name as an individual, hold nothing; it is by his prerogative that he takes by forfeiture or escheat; he claims and owns royal fish, as they are called, by his prerogative, and yet they may be granted. 1 *Black. Com.* 298. In short, he is considered, by that law, as having a mere political character, and claims and holds all that he has as king, but may grant at his pleasure. *Davies* 152. It is palpable that this course of reasoning would go to prove that the proprietary title to lands in New Jersey is worthless. Charles acquired the main land as king; he was entitled to it only by his prerogative. If he was disabled to grant what he held as king he could not convey an acre of land.

But it is again asserted, that the grantee of the king, and those claiming under him, hold subject to the common right

of fishery vested by the common law in the people. This is in truth the pivot upon which the defendant's case rests; but the principles we have established, and the cases we have produced, demolish it. We have shewn that the grant of the king passes the very title and propriety of the land and water, absolutely and without any such restriction; and that a right of several fishery passes with the soil. Where a several fishery passes, a common right of fishery cannot exist; they are utterly incompatible, for the right of several fishery is altogether *exclusive*. This assertion, then, is but a repetition of the fundamental position, that the king cannot grant *several fishery* in a navigable river. What authority has been produced? What *dictum* that the king's grantee of the soil of a river holds subject to the right of fishery? Lord Hale says, it is true, that he holds subject to the *jus publicum*, but he tells us what that is: it is the right of "passage and re-passage with their goods by water," (*Har. L. T.* 36,) which must not be taken from them under pretence of a royal grant. For this is the right of the people by the law of nature, rivers being great highways furnished by the great Creator for the use of the human race. Common of fishery is no more a part of the *jus publicum*, than common of pasturage belonging in all the tenants of a particular manor.

· Again—it is said, that the king of England, alone, could do no act to divest the right of the people, without the aid of the other branches of the legislature, and, therefore, his grants are void, so far·as the common right of fishery is concerned. This is part of the old error the counsel for the defendant have fallen into in denying that the king is, by the common law, the true owner and proprietor of everything acquired in his regal capacity. That he is such absolute owner has been fully proved; and that he may, in all cases in which he is not restrained by statute, convey in full propriety, has also been demonstrated. No authority

has been shewn, or can be found, to support this novel idea; it is utterly inconsistent with the whole system of the common law, touching the prerogative of the king.

It is also said, that the great object of these original grants was the settlement of the country, and that they must be construed so as best to promote that end; that the right of fishing, being a common right, must be considered as reserved to them by these grants, because it is for their benefit that it should be retained. This is a strange doctrine, as applied to grants, deeds and muniments of title to land; if it is adopted, and acted upon, and improved by modern ingenuity in the best manner for *the good of the people*, it will soon render such instruments of little avail to the owner. Fortunately, however, it happens to be in direct repugnancy to the law of the land, by which the construction of all solemn conveyances, and of the words inserted in them, have been fully settled, so as never to admit considerations of political policy in any manner to affect their legal operation. But if we could admit, for a moment, such considerations into this case, we might ask, what was the best plan to effect an actual settlement of this wilderness in the reign of Charles II.? Surely it was by encouraging a few men of enterprise and capital to embark in, and devote themselves to, the object. The settlers were to be brought from England, and maintained and protected here till able to take care of themselves. Hence, the policy to encourage the immediate adventurers by most extensive grants and powers, and of leaving it to them to parcel out the lands without restriction. The duke first sold to *two*, who would probably never have purchased if the powers and rights of the original grant from the king had been curtailed; these sold *to the twelve;* they *to the twenty-four;* and they again *to the forty-eight, on the original terms*, leaving them to make their own contracts with future adventurers. And even as to the sub-purchasers, the small proprietors, surely the right now in discussion being secured

to the landholder would be an additional inducement to substantial purchasers to fix themselves on the waters of the territory.

It is further objected, that we have not been able to shew that the king of England has ever granted a right of *several* fishery in a navigable river since the statute of *Magna Charta.* If this be true, which is denied, it is because *several fishery* is dependent *on the ownership of the soil,* and because all the lands of England, especially those on their rivers and the sea shore, have been granted and parcelled out ever since the time of the Norman conquerer. England being an island, the English have been a commercial nation time out of mind, and the jurisdiction and property of their great rivers, from early times, has been distributed among their great corporations. Sir John Davies says, " the city of London, by charter from the king, hath the river Thames granted to them, but because it was conceived that the soil and ground of the river did not pass by that grant, they *purchased another charter, by which the king granted to them* solum et fundum *of the said river.*" He does not say which of the kings gave this charter, but it is not likely that both grants were prior to *Magna Charta.*

The case of *Bulbroch* v. *Goodire,* proves that several fishery is now held in the Thames by individuals claiming under the corporation. 3 *Bur.* 1768. In 3 *Chitty's Criminal Law* 974, we have an indictment for taking oysters from the oyster fishery of the borough of Lin Reges in the county of Norfolk, within the limits and precincts of the port of Lin Reges. This, no doubt, in the case of several fishery belonging to that corporation, as owners of the river. In *Davies* 155, this case is stated : " King Henry VIII. granted to Strangeways *totam illam liberam piscariam vocatum* the fleet in Abbotsbury, *which is a bay and creek of the sea ;*" and he adds, " *this was a several fishery on a branch of the sea.*" The assertion is then incorrect in point of fact, and it is not doubted, but that if we had a full collection of royal

grants to corporations and individuals since *Magna Charta*, many would be found granting the *solum et fundum* of navigable rivers in England.

It has been further asserted, that the people have always exercised the right of taking fish; and a grantee of the proprietors now, for the first time, has set up this pretence. There is no foundation in fact for either branch of this assertion. That the people have been in the habit of taking oysters from the unappropriated beds may be true, but that such a right has been exercised in places where the soil of the river has been sold and located is denied, and has not been proved. It is a matter of fact, and ought to have been proved. The defendant gave some evidence, that in former times, before the survey, the Woodbridge people insisted on their right, and so did the owner of our main farm insist on his, and resist theirs; but it is well known that the Woodbridge men claimed the right of fishing *not as a right of common, but under their grant from the proprietors, commonly called the Woodbridge charter*. When this action was brought, they discovered that the charter upon which they relied did not cover this oyster-bed, and then they, for the first time, by the advice of their learned counsel, took this new ground of common right. There is not a particle of evidence that they ever before asserted a title by general right of common fishery; on the contrary, they claimed by grant, as the plaintiff does. The people of this state exercise a right of fowling and hunting in the waste of the proprietors. Surely when the proprietors sell, and the purchaser encloses and improves, such a right could not remain; and yet that is precisely the same sort of common right as that exercised by our adversaries in regard to fishing.

As to this being a new claim, now for the first time got up, the documents produced should have shielded us from this reproach; we have shewn many grants of the soils of the rivers from the public records, and many more from the earliest times no doubt exist. Is it not a notorious fact, that

numerous fisheries have been held on all our great rivers for more than a century without dispute? Many actions of trespass have been brought in this court, and heavy damages recovered *for taking fish from such several fisheries ;* not merely for hauling on the land, but for *taking the fish swimming in the river.* The doctrine upon which this non-suit was ordered will destroy all this species of property from Powles Hook to Cape May. It is well known that seines may be drawn without touching the land. Shad fisheries of immense value, which have been transmitted from father to son, time out of mind, are destroyed at a stroke, though the property in them has been admitted by the legislature in all their acts taxing and regulating them. The argument, then, from possession and usage, is altogether on the side of the plaintiff.

This doctrine of a right of several fishery is not confined to New Jersey; it is recognized and protected in many of our sister states. In Massachusetts, the fisheries all belong to the public corporations, who distribute them out among the different towns. This proves that they were considered as passing by their charters, and that there is no right of common in these fisheries in the whole mass of the people. In Connecticut, as early as the year 1790, the Supreme Court, in the case of *Adgate* v. *Story,* determined that the adjoining proprietor might maintain trespass against one who drew a seine in a navigable river fronting his land. 1 *Swift's System* 343. In Pennsylvania, it has been judicially admitted, that a several fishery might have been granted by the proprietors before the extinction of their title, or by the state since. 2 *Bin.* 475.

The act of the legislature of Pennsylvania vesting in the commonwealth the estates of the late proprietors, grants *all the soil, royalties and franchises* granted by Charles II. to William Penn, and the Supreme Court, in the cases just cited, admit that the right of several fishery passed. 1 *Dal. Penn. Laws* 822.

· In Maryland, upon Lord Baltimore's grant, it was held that the king had power to grant several fishery, and that the forms of that grant, not so comprehensive as ours, did convey it. The only doubt was on a proviso *reserving the common right of fishery to the people of England. Har. & M'Hen. Rep.* 564. And, finally, we find the settlers *in West Jersey* contracting for the right of common of fishery with the proprietors, and the proprietors granting it to them. *Leaming & Spicer* 390. But no such grant has ever been made by the eastern proprietors, and the concession and acceptance of it shews that, in the opinion of both parties, it did not exist without it.

IV. The only remaining point to be discussed is, whether the title of several fishery was surrendered and given up to Queen Anne when the proprietors yielded up to her their jurisdiction and powers of government? This argument was delicate and dangerous, because it gives up at once all the rest of the case, admitting that the right in question did pass by the original grants to the proprietors; for if it did not exist it could not be surrendered. And here it is to be remarked, that the crown of England executed every reasonable act of further assurance to protect and enforce the grants to the proprietors while the government remained in the proprietors, as the documents laid before the court fully prove. The only trouble they met with was from the duke's governors in New York. When he became king, he was too much engaged in his own plans at home to spend time in the affairs of his colonies; but after the revolution, and towards the latter end of the reign of William III., the British court betrayed the same disposition which had before appeared in regard to other colonies, to infringe the liberal charters which had been first granted to the adventurers in America; and the crown lawyers began to question the validity of that part of the grant of Charles II. which conveyed the powers of government in *extenso.* And so many impediments to the liberal views and exertions of

the proprietors to settle the country were thrown in the way, that they judged it most expedient to open a treaty for the surrender of the government to the crown of England, so far as related to the great political powers of government.

*Leaming & Spicer* 588, give the propositions of the proprietors. In the 9th section it proposed that the proprietors *may be lords of the soil* and hold courts. *Ib.* 595, the answer of the board of trade is, that they have no objection to this, in case those officers be like such as constitute the courts leet and baron in England. *Ib.* 590, in section 13th, the proprietors reserve all royalties, enumerating them, "to remain to the proprietors *with all other privileges and advantages, as ample as in the grant and confirmation to them of the* 14*th March,* 1682." *Ib.* 596, the answer of the board is, "This article may be reasonable, except as to the goods and chattels of traitors, &c., *which is matter of state;"* and they add these significant words, "Nor can right accruing to the proprietors from the seas adjacent be well circumscribed."

With this *protocol* before us, we proceed to the final treaty, which is found in the instrument called the surrender. This instrument recites the original grants, and that the king did grant to the duke, and he to the proprietors, "full and absolute power and authority to appoint governors, and *to correct, punish, pardon, govern and rule all the adventurers, according to such laws, &c., as the duke or his assigns should establish, with power to use and exercise martial law in case of insurrection, rebellion, or mutiny, and to make war against all persons who should attempt to inhabit without the leave of the duke or his assigns."* *Leaming & Spicer* 609, 12, 13. It then recites "that her majesty Queen Anne had been advised that the proprietors have no power to execute any *of the said powers,* but that the same belonged to her majesty in right of her crown." It further recites, "that the proprietors, being desirous to submit themselves to her majesty, are willing to surrender

all their pretences *to the said powers of government.*" Then they do surrender and yield up to the queen *all these the said powers and authorities* to correct, punish, pardon, govern, and rule;" *and also the right to make laws and appoint governors;* "*and also the powers to use and exercise martial law, and to make war,*" &c.

Is it not, then, self-evident that this deed of surrender only embraced the great·political powers of government which, as the country was becoming populous, were inconsistent with dependence on the British crown; and that it did not convey or surrender any estate, property, franchise, royalty, or privilege appertaining to the soil, rivers, and bays which entered essentially into the estimate of the value of the soil, and had become their property? It was so understood by the queen and her council. Immediately after the surrender, Lord Cornbury was appointed the first royal governor. He received written instructions, the 36th section of which recommends passing such laws "as will secure the right of property of the soil to the proprietors," and "*all such privileges as were expressed in the conveyance to the duke of York, excepting only the right of government.*" *Leaming & Spicer* 628, *sec.* 36.

Now, unless this court is prepared to pronounce that the claim *of right of common of all fish* is one of those great political rights which pertained essentially to the crown of England, and a part of the right of government, it cannot be within that deed of surrender. Indeed, unless the words of the deed of surrender are disregarded as well as the manifest intent and meaning of the contracting parties, there is nothing in this objection.

KIRKPATRICK, C. J. This is an action of trespass for entering upon the plaintiff's oyster-bed in the mouth of the Raritan, at Perth Amboy, and taking and carrying away his oysters there *planted.* It was brought to trial at the Middlesex Circuit, in December last, when, upon the case

made out, the plaintiff was non-suited; and upon coming in of the *postea* there was a rule to shew cause why that non-suit should not be set aside and a new trial granted.

It appeared in evidence, upon the trial, that the plaintiff, on the 14th of February, 1814, had purchased in, and, at the time of the supposed trespass, was in possession of, a certain farm, commonly called Nevill's farm, containing one hundred and seventy-five acres, or thereabouts, lying on the river Raritan, opposite to this oyster-bed, and extending, according to the words of the deed, *to the bank of the river;* that one Joseph Coddington, who had before owned and possessed the said farm, and under whom the plaintiff held, had, twenty years ago, and more, and while so in possession, staked off a part of the oyster-bed in question, and that part of it, too, from which these oysters were taken, and had, during his time there, claimed the exclusive right of taking oysters upon the bed so staked off; but the people had always disputed that right, had entered upon it, and taken oysters from it, when they pleased, and if opposed by Coddington, that the strongest usually prevailed.

And it further appeared, that the plaintiff, soon after he came into the possession of the said farm, staked off the present bed, being greater, but including Coddington's, began to plant oysters upon it, and has continued to plant more or less, at the proper seasons, every year since that time; that some of the stakes, by which it is so staked off, stand below low water mark, but that they are so slender as to oppose no obstruction to the navigation of the river, even with the smallest craft; that this bed is about fifty yards below common low water mark; the tide ebbs and flows over it; it is frequently bare at the full and change of the moon, and commonly, though not always so, in the fall and spring; that there have always been oysters upon it, as well as upon the other beds in these waters, and that the space between it and the shore is what they call a mud flat, commonly covered with water, but not a channel for vessels

or other craft usually plying in that river. And it further appeared, that the plaintiff, on the 3d of April, 1818, by virtue of a warrant of location from the proprietors of East Jersey, caused a survey to be made for himself there of 41.59 acres of land covered with water, including a certain survey of wharves formerly made to·one Sonmans, and leaving for his survey 35.59 acres, including the oyster-bed in question. And although it appeared, that this survey had been made before the supposed trespass, and had been approved and recorded in due form, yet it did not appear, that such approving and recording had been before the said trespass, the *time* of the recording not appearing upon the record. And it further appeared in evidence, that the defendant had entered upon the said bed, so staked off, and taken oysters there, at the time in the declaration set forth. And, indeed, it was admitted by the defendant himself, that he, together with others, had so done, but merely with a view of trying the plaintiff's pretended right, and not with a view of injuring the bed, or taking the oysters further than was necessary for this purpose.

Upon this state of facts, the defendant moved for a non-suit—1. Because the plaintiff had shewn no title arising from possession only, that is, an exclusive and adverse possession. 2. Because he had shewn no title under the proprietors, it not having appeared that his survey had been approved and recorded before the supposed trespass was committed. 3. Because the proprietors themselves had no title which they could convey, even if the form of conveyance had been complete. Upon the last of these reasons the plaintiff was called. But yet, still, in shewing cause upon this rule, the defendant's counsel have insisted upon the first and second reasons also, against the claim of the plaintiff, which he still maintains; so that it becomes necessary to look a little into each of them in their order. And

1. As to the mere possession. This is no other way proved than by shewing the conveyance for, and the pos-

Arnold *v.* Mundy.

session of, the Nevill farm on the shore opposite to this oyster-bed, extending, to make the most of it, to the water's edge only; and by shewing further, the staking off of the said bed, the planting of oysters upon it, and sometimes fishing and taking oysters there, as other people also did, the claim of exclusive right notwithstanding.

Now, upon this it is to be observed, that though a grant of land to a subject or citizen, bounded upon a fresh water stream or river not navigable, and where the tide neither ebbs nor flows, extends to the channel of such river, *usque ad filum aquæ,* as they have it in our old books; yet that a grant of land bounded upon a river or other water which is navigable, and where the tide does ebb and flow, extends to the edge of the water only, that is to say, to high water mark, and no further. See the case of the river Banne, (*Davies* 152, 155); *Har. L. T.* 5; *Carter* v. *Marcott,* (*Bur.* 2162). All pretence of possession, therefore, in this case, as being connected with, and appurtenant to, the adjacent land, must fail. The grant for that could extend only to high water mark, and it could, therefore, carry with it no part of the adjacent land covered with water. And if the plaintiff would set up a possession founded upon the staking off the bed, planting oysters upon it, and sometimes fishing there, even if it were a subject matter that could be taken possession of in that way, that possession has not been proved to be either so complete, so exclusive, or so continued, as to establish a right against those having equal claim with himself. He pretends to no prescription, none such exists in this country; he pretends to no grant, none has even been mentioned. He places himself in the situation of a fisherman, who, because he has fished for many years, would claim the exclusive possession of the waters, and the exclusive right of fishing in them. Upon the ground of possession merely, then, I think the plaintiff cannot stand. But the non-suit cannot be maintained upon this alone, because he sets up another title.

2. As to the form of the conveyance and the operation of the survey. The proprietors of East Jersey are tenants in common of the soil; their mode of severing this common estate is by issuing warrants, from time to time, to the several proprietors, according to their respective rights, authorizing them to survey, and appropriate in severalty, the quantities therein contained. Such warrant does not convey a title to the proprietor, he had that before; it only authorizes him to sever so much from the common stock, and when so severed, by the proper officer, it operates as a release to him for so much. This is the case when the proprietor locates for himself. When he sells his warrant to another, that other becomes a tenant in common with all the proprietors *pro tanto*, and, in the same manner, he proceeds to convert his common, into a several right. Regularly there is a deed of conveyance upon the transfer of this warrant for so much of the common property and that deed of conveyance, and the survey upon the warrant, is the title of the transferee. It is true, that the survey must be inspected and approved by the board of proprietors, and must be carefully entered and kept in the secretary's office, or in the office of the surveyor general of the division, but this is for the sake of security, order, and regularity only, and is, by no means, the passing of the title. It proves, that the title has already passed, but it is not the means of passing it. It may be likened to the acknowledgement of a deed by a *femme covert*. Her deed cannot prevail against her, unless such acknowledgement be regularly made and recorded; yet such acknowledgment does not pass the title, the deed has already done that, and it operates from the day of its date.

The view which has been taken of this subject, and so much insisted upon by one of the defendant's counsel, I think is quite too narrow. He has placed himself upon the third section of the act of January 5, 1787, " for the limitation of suits respecting titles to lands." That section enacts,

" that a survey màde, inspected, and approved by the coun-cil of proprietors, and by their order recorded in the secre-tary's office, or in the surveyor general's office, shall, from and after such record is made, preclude and for ever bar such proprietors from any demand thereon, any plea of deficiency of right, or otherwise, notwithstanding."

Now this is a statute merely for the limitation of suits. It is made for the benefit of him that has the survey; if he procures it to be inspected, approved, and recorded, it is a bar against the proprietors and those holding under them; if he does not do so, it is no bar, but stands just where it did before the statute was made. The statute is not imperative upon him that has the survey to procure it to be inspected, approved, and recorded; it does not make it void in case he does not do so, but leaves it where it was before, and he loses his bar.

Let us see, then, how those surveys were viewed before this statute. We shall be enabled, pretty satisfactorily, to do this, by looking into the act of March 27, 1719. In the tenth section of that act, it is enacted, " that the surveyor-general shall hold a public office, in which shall be carefully entered and kept the surveys of all lands thereafter to be made; that such entries shall be considered as matter of record, and may be pleaded as evidence in any of the courts," &c., but it prescribes no time within which they shall be entered, nor does it make them void if not so entered. In the eleventh section of the same act it is recited, " that great inconveniences have happened by making and not recording of surveys, whereby many have not only got lands surveyed which have been formerly surveyed, not knowing of any former survey, but have settled, and made great improve-ments on the same, and have been afterwards ousted thereof;" and then it is provided, " that surveys heretofore made shall be brought in and recorded within a certain time, or for ever after to be void and of no effect as against succeeding surveys of the same lands duly recorded." Now,

if those prior surveys had been of no effect until they were approved and recorded, how could those who had settled and improved under posterior surveys be ousted by them ? or how could the evil here complained of ever have happened at all ? and if they had effect that effect is no way impaired by this act, unless it be against posterior surveys of the same lands, duly approved and recorded. The truth is, I believe, that the survey of the proper officers, under a warrant duly issued for that purpose, has always been considered as the act of severance; the inspecting, approving and recording, as relating back to that act; and the party surveying, as having an estate in severalty from that time. And, of course, except in the case of posterior surveys, the time of inspecting, approving and recording has not been thought material. And, as to the mode of partition, however necessary it may have been in other cases of tenancy in common, that it should be made by deed; yet in this proprietary estate, upon locations of this kind, I believe it never has been so done. As to the form of the conveyance, therefore, in this respect, the defendant's objection cannot prevail.

3. As to the right of the proprietors to convey. This is the great question in the cause, and though we have taken time since last term to look into it, yet I must confess, for myself, that I have not done so in so full and satisfactory a manner as could have been wished; and my apology must be, that during a very great part of the vacation, I have been necessarily abroad, attending to other official duties, and during the time I had assigned to myself for this purpose, I have been so much indisposed as not to be able very satisfactorily to attend to business of any kind. I have, nevertheless, so far looked into it as to satisfy myself of the principle that must prevail.

The grant of Charles II. to the duke of York was not only of territory but of government also. It was made, not with a view to give that territory and that government to the duke, to be enjoyed as a private estate, but with a view

to the settlement of it as a great colony, to the enlargement of the British empire, and the extension of its laws and dominions. In construing this grant, therefore, we ought always to have our eye fixed upon these great objects. If we shall find some things contained in it, which by the laws of England, as well as of all other civilized countries, and even by the very law of nature itself, are declared to be the common property of all men, then, by every fair rule of construction, we are to consider these things as granted to him, as the representative of the sovereign, and as a trustee to support the title for the common use, and especially so, if we shall find that the king himself had no other dominion over them.

The grant is not only of all lands, but of "all rivers, harbors, waters, fishings, &c., and of all other royalties, *so far as the king had estate, right, title or interest therein*, together with full and absolute power and authority to correct, punish, pardon, govern and rule all such the subjects of the king, his heirs and successors, as should, from time to time, adventure themselves into the said territory;" and for this purpose to make statutes, ordinances, &c., provided the same should not be contrary to the laws, statutes and government of England, but saving to the inhabitants, nevertheless, the right of appeal, and to the crown the right of hearing and determining the same. The duke was to govern, but he was to govern substantially, according to the principles of the British constitution. The colonists were to be governed by him, but, by the very words of the charter, they were to be British subjects, and to enjoy the protection, liberty and privileges of the British government. In order to accomplish those great objects, the king selected his royal brother, and granted to him all the rights which he himself had, or could exercise in and over this great territory, saving to himself only the right of hearing appeals. Those things, therefore, which were, properly speaking, the subjects of property, and which the king himself could divide

and grant severally to the settlers, the duke, by virtue of this charter, could also divide and grant; but those things which were not so, and which the king could not grant, but held for the common use, the duke necessarily held for the same use, and in the same way.

Let us see, then, upon what principle 'the king held the subject matter of this inquiry; what right he had in it, and how far he could dispose of it.

Everything susceptible of property is considered as belonging to the nation that possesses the country, and as forming the entire mass of its wealth. But the nation does not possess all those things in the same manner. By very far the greater part of them are divided among the individuals of the nation, and become *private property*. Those things not divided among the individuals still belong to the nation, and are called *public property*. Of these, again, some are reserved for the necessities of the state, and are used for the public benefit, and those are called *"the domain of the crown or of the republic;* others remain common to all the citizens, who take of them and use them, each according to his necessities, and according to the laws which regulate their use, and are called *common property*. Of this latter kind, according to the writers upon the law of nature and of nations, and upon the civil law, are the air, the running water, the sea, the fish, and the wild beasts. *Vattel lib. i,* 20. 2 *Black. Com.* 14. But inasmuch as the things which constitute this *common property* are things in which a sort of transient usufructuary possession only can be had; and inasmuch as the title to them and to the soil by which they are supported, and to which they are appurtenant, cannot well, according to the common law notion of title, be vested in all the people; therefore, the wisdom of that law has placed it in the hands of the sovereign power, to be held, protected, and regulated for the common use and benefit. But still, though this title, strictly speaking, is in the sovereign, yet the use is common to all the people. This prin-

ciple, with respect to rivers and arms of the sea, is clearly maintained in the case of the royal fishery upon the Banne, in Ireland, in *Sir John Davies'* report of that case 56, 57, and in *Hale's* treatise *de jure maris et brachiorum ejusdum.* Bracton, too, quoting from Justinian, says, " *publica sunt omnia flumina et portus ideoque jus piscandi omnibus commune est in portu fluminibusque, et riparum etiam usus est publicus jure gentium, sicut et ipsius fluminis."* Bracton *lib. i, chap.* 12.

In Lord Fitzwalter's case, (1 *Mod.* 105) it is said that in an action of trespass for fishing in a river where the tide flows and reflows, it is a good justification to say, that the *locus in quo est brachiam maris in qua unusquisque subjectus domini regis habet et habere debet liberam piscariam,* for that, *prima facie,* the fishing is common to all. In *Warren* v. *Matthews,* (6 *Mod.* 73) we are told *every subject of common right may fish with lawful nets in a navigable river, as well as in the sea, and the king's grant cannot bar him thereof.* Same case (*Salk.* 357.) *Carter* v. *Marcott* (*Bur.* 2162.) *In navigable rivers, the fishery is common, it is* prima facie *in the king, but is public and for the common use.*

Nothing can be more clear, therefore, than that part of the property of a nation which has not been divided among the individuals, and which Vattel calls *public property,* is divided into two kinds, one destined for the use of the nation in its aggregate national capacity, being a source of the public revenue, to defray the public expense, called the *domain of the crown,* and the other destined for the common use and immediate enjoyment of every individual citizen, according to his necessity, being the immediate gift of nature to all men, and, therefore, called the *common property.* The title of both these, for the greater order, and, perhaps, of necessity, is placed in the hands of the sovereign power, but it is placed there for different purposes. The citizen cannot enter upon the domain of the crown and apply it, or

Arnold *v.* Mundy.

any part of it, to his immediate use.    He cannot go into the king's forests and fall and carry away the trees, though it is the public property ; it is placed in the hands of the king for a different purpose, it is the domain of the crown, a source of revenue ; so neither can the king intrude upon the common property, thus understood, and appropriate it to himself, or to the fiscal purposes of the nation, the enjoyment of it is a natural right which cannot be infringed or taken away, unless by arbitrary power ; and that, in theory at least, could not exist in a free government, such as England has always claimed to be.

But if this be so, it will be asked, how does it happen that in England, whose polity in this respect we are now examining, we find not only navigable rivers, but also arms of the sea, ports, harbors and certain portions of the main sea itself upon the coasts, and all the fisheries appertaining to them, in the hands of individuals.    That the fact is so, cannot be controverted ; but how it became so, is not so easy, at this period of time, satisfactorily to shew.    So far as it depends upon royal grant, however, it seems pretty clear, that it has always been considered as an encroachment upon the common rights of the people.

An exclusive right of fishing in a navigable river, is said to be a royal franchise, that is, a privilege or branch of the royal prerogative, granted by the king to a private person. This royal prerogative, we are told, was first claimed by the crown, upon the coming in of William the conqueror, and was considered by the people to be a usurpation of their ancient common rights.    Accordingly, in *Magna Charta,* which is said to be nothing more than a restoration of the ancient common law, we find this usurpation broken down and prohibited in future.    That charter, as passed in the time of King John, enacts, " *that where the banks of rivers had first been defended in his time,* (that is, when they had first been fenced in, and shut against the common use, in his time) *they should be from thenceforth laid open."*    And,

by the charter of Henry III., which is but an amplification and confirmation of the former, it is enacted, " *that no banks shall be defended* (that is, shut against the common use) *from henceforth, but such as were in defence in the time of King Henry our grandfather, by the same places and the same bounds as they were wont to be in his time.*" By this charter, it has been understood, and the words fairly import, that all grants of rivers, and rights of fishery in rivers or arms of the sea, made by the kings of England before the time of Henry II., were established and confirmed, but that the right of the crown to make such royal grants, and by that means to appropriate to individuals what before was the common right of all, and the means of livelihood for all, for all future time, was wholly taken away. And whatever diversity there may be found in the books, with respect to the different kinds of fishery, it can no way affect the operation of the charter in this respect, because that forbids all manner of fencing in, or shutting, fisheries against the common use. All claim, therefore, of an exclusive right of fishery in a navigable river, founded upon the king's grant, or prescription, which presupposes a grant, must reach as far back as Henry II. This we find expressly laid down by Sir William Blackstone, one of the greatest men that ever wrote upon the laws of England. 2 *Black. Com.* 39. Lord Chief Justice Holt, too, lays it down as a principle, " *that the king's grant cannot bar a subject from fishing in a navigable river;*" (6 *Mod.* 73; *Salk.* 357) and pretty nearly to the same effect is *Mod.* 105. The case of *Carter* v. *Marcott* seems to admit, that such a right can be maintained by prescription, which runs back beyond the memory of man. *Bur.* 2162.

Against this doctrine has been cited, and much relied upon, Lord Hale's treatise *de jure maris brachiorumque ejusdem,* given to us by Hargrave in his law tracts, and the case of the royal fishery upon the river Banne, in Ireland, by Sir John Davies. But making a little allowance for

both the judge and the reporter being disciples of Seldon, and converts to his doctrine of the *mare clausum*, everything they have said may, in my view of it, be admitted in the fullest extent, and yet the positions here laid down be in no way shaken; nay, indeed, I have rather considered them as the great foundations upon which they are to rest.

. Lord Hale says, " the sea, and the arms of the sea, and the navigable rivers in which the tide ebbs and flows, are of the dominion of the king, as of his proper inheritance; and that this dominion embraces, also, the shores, litora, the spaces covered with the slime and mud deposited by the water between the high and the low water mark, in the ordinary flow and reflow of the tide ; that this dominion consists, first, in the right of jurisdiction which he exercises by his maritime courts ; and, secondly, in the right of fishing in the waters ; but that though the king is the owner of these waters, and, as consequent of his property, hath the primary right of fishing therein, yet the common people of England have regularly a liberty of fishing in the sea, and the creeks, and the arms thereof, as a public common piscary, and may not, without injury to their right, be restrained thereof." This is his general doctrine.

He then proceeds and says, that " though the king hath this right *communi jure*, yet a subject, also, may have such right, and that either by king's grant or prescription; that the king may grant fishing within a creek of the sea, and that he may also grant a navigable river that is an arm of the sea, with the water and soil thereof."

But when he speaks of this power of granting, as a common law right in the king, he must be understood as speaking of the common law before it was confined and restrained by *Magna Charta*, and as it was received and acted upon by the kings of England before that time; and accordingly all the grants which he has been able to produce, after the most diligent search, are before the date of that charter. He has given, in support of his doctrine,

five grants, and five only, one by Canute the Dane; two by William the Conqueror; one by Edward the Confessor, and one by John himself before passing of this statute. And that the law was so understood at that time, or rather so construed by arbitrary kings; that they did so grant, and that those grants were confirmed by *Magna Charta*, and are now the foundation of most of the several rights of fishery in England, cannot be doubted. And, besides this, Lord Hale, in his treatise, has nothing material on this subject that I can discover. In examining this subject, I do not speak of the *jure regium* as it is called, *the right of regulation* which the king has in all the navigable waters of the kingdom; that is quite another thing, and wholly foreign from the present question.

Then as to the case of the Banne water in Ireland. It was this: *the plaintiff had obtained a royal grant for the territory of Rout, adjoining the river Banne,* in which grant was contained, among other things, *piscarias, piscationes, aques, aquarum, cursus, &c., in territoris predicto, reserving to the crown three parts of the said fishery.* And the question was, whether this fishery passed by the grant? and it was held, that it did not; not, indeed, upon the principle, that the king could not grant in that case, but upon the construction of the grant.

In the discussion of the case, however, it was laid down, "that every navigable river, so far as the tide ebbs and flows, is a royal river, and that the fishery of it is a royal fishery, and belongs to the king by his prerogative; and the reason is, that the river participates of the nature of the sea, and is said to be a branch of the sea so far as it flows; and the sea is not only under the dominion of the king, but it is also his proper inheritance, and, therefore, he shall have the land gained out of it, and also the grand fishes of the sea, such as whales, sturgeons, &c., which are royal fish, and no subject can have them without the king's special grant; and he shall have the wild swans also, as royal fowls, on the sea and its branches."

Now what does this, taken in its whole extent, prove ? It proves, that the wisdom of the law has placed the titles of rivers, &c., in the king ; that if the river shall leave its bed, or if otherwise, there shall be alluvions or derelictions by the waters, the land so made shall then, and not before, belong to the king, as part of his domain ; and that he has an exclusive right in these waters *to his royal fish and swans,* but it proves no more. Nay, indeed, it does prove more, for the very position, that he has an exclusive right to the royal fish and swans, proves that he has no such right to any others. It would be absurd to contend, that he had an exclusive prerogative right to these fish and swans, if he had also the same right to all the fish in the river, and all the aquatic birds upon it.

Again—it is said, in the same book, " *that, by the common law of England, a man may have a proper and several interest as well in a water or river as in a fishery ; and that, therefore, a water may be granted.*" The cases produced to support the latter part of this position are grants from private individuals to private individuals, but even if they were from the king, it would not alter the case, for there is no doubt that many such exist ; but the question is, can such a grant be made by the king since the reign of Henry II ? It is enough to say, that no instance of it has been produced. Recent confirmations of ancient grants made before that time, which are recognized and established by the charter of Henry III. prove nothing to the purpose.

Upon the whole, therefore, I am of opinion, as I was at the trial, that by the law of nature, which is the only true foundation of all the social rights ; that by the civil law, which formerly governed almost the whole civilized world, and which is still the foundation of the policy of almost every nation in Europe ; that by the common law of England, of which our ancestors boasted, and to which it were well if we ourselves paid a more sacred regard ; I say I am of opinion, that, by all these, the navigable rivers in which

the tide ebbs and flows, the ports, the bays, the coasts of the sea, including both the water and the land under the water, for the purpose of passing and repassing, navigation, fishing, fowling, sustenance, and all the other uses of the water and its products (a few things excepted) are common to all the citizens, and that each has a right to use them according to his necessities, subject only to the laws which regulate that use; that the property, indeed, strictly speaking, is vested in the sovereign, but it is vested in him not for his own use, but for the use of the citizen, that is, for his direct and immediate enjoyment.

I am of opinion, that this great principle of the common law was, in ancient times, in England gradually encroached upon and broken down; that the powerful barons, in some instances, appropriated to themselves these common rights; that the kings themselves, also, in some instances during the same period, granted them out to their courtiers and favorites; and that these seizures and these royal favors are the ground of all the several fisheries in England, now claimed either by prescription or by grant; that the great charter, as it is commonly called, which was nothing but a restoration of common right, though it did not annul, but confirmed, what had been thus tortiously done, yet restored again the principles of the common law, in this as well as in many other respects; and since that time no king of England has had the power of granting away these common rights, and thereby despoiling the subject of the enjoyment of them.

I am of opinion, that when Charles II. took possession of this country, by his right of discovery, he took possession of it in his sovereign capacity; that he had the same right in it, and the same power over it, as he had in and over his other dominions, and no more; that this right consisted chiefly in the power of granting the soil to private citizens for the purposes of settlement and colonization, of establishing a government, of appointing a governor, of conveying to him all those things appurtenant to the sovereignty, com-

monly called royalties, for the benefit of colonists; but that he could not, and never did, so grant what is called the *common property* as to convert it into private property; that these royalties, therefore, which constitute that *common property* of which the rivers, bays, ports, and coasts of the sea were part, by the grant of King Charles, passed to the duke of York, as the governor of the province exercising the royal authority for the public benefit, and not as the proprietor of the soil, and for his own private use; and that if they passed from the duke of York to his grantees, *which is a very doubtful question,* then, upon the surrender of the government, as appurtenant thereto, and inseparable therefrom, they reverted to the crown of England.

And I am further of opinion, that, upon the Revolution, all these royal rights became vested in *the people* of New Jersey, as the sovereign of the country, and are now in their hands; and that they, having, themselves, both the legal title and the usufruct, may make such disposition of them, and such regulation concerning them, as they may think fit; that this power of disposition and regulation must be exercised by them in their sovereign capacity; that the legislature is their rightful representative in this respect, and, therefore, that the legislature, in the exercise of this power, may lawfully erect ports, harbors, basins, docks and wharves on the coasts of the sea and in the arms thereof, and in the navigable rivers; that they may bank off those waters and reclaim the land upon the shores; that they may build dams, locks and bridges for the improvement of the navigation and the ease of passage; that they may clear and improve fishing places, to increase the product of the fishery; that they may create, enlarge and improve oyster-beds, by planting oysters therein in order to procure a more ample supply; that they may do these things themselves, at the public expense, or they may authorize others to do it by their own labor, and at their own expense, giving them reasonable tolls, rents, profits, or exclusive and temporary enjoyments; but still

this power, which may be thus exercised by the sovereignty of the state, is nothing more than what is called the *jus regium*, the right of regulating, improving, and securing for the common benefit of every individual citizen. The sovereign power itself, therefore, cannot, consistently with the principles of the law of nature and the constitution of a well ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people.

From this statement, it is seen that, in my opinion, the proprietors, as such, never had, since the surrender of the government, any such right to, interest in, or power over, these waters, or the land covered by them, as that they could convey the same and convert them into private property; and that, therefore, the grant in question is void, and ought not to prevail for the benefit of the plaintiff, and, of course, that the rule to shew cause must be discharged.

ROSSELL J. It is a fact, as singular as it was unexpected in the jurisprudence of our state, that the taking a few bushels of oysters, alleged to be the property of the plaintiff in this suit, should involve in it questions momentous in their nature, as well as in their magnitude; calling forth the talents, learning, and industry of our bar; affecting the rights of all our citizens, and embracing, in their investigation, the laws of nations and of England, the relative rights of sovereign and subjects, as well as the municipal regulations of our own country.

The plaintiff's counsel contend, that the non-suit granted on the trial of this cause, by the Chief Justice, should be set aside, on two grounds: 1. That the *locus in quo* whereon these oysters were laid, was his own proper freehold, by virtue of a proprietary right duly laid thereon, returned and approved of by the council of proprietors of East Jersey, and recorded by their authorized officer, in

consequence of which he claims a several fishery. 2. That he had purchased and planted those oysters on the spot from whence they were taken by the defendant; and as a public notice, that he, by placing them on the soil of the river Raritan, had not abandoned his property in them, he had surrounded them with small stakes. The defendant claims a right to those oysters, having taken them from a bed called an oyster-bed, situate on the river Raritan, below the common low water mark, and on which it had been usual for the people of East Jersey to fish for oysters, from the first settlement of the country.

In support of the first of these positions, the counsel for the plaintiff contend, that Charles II. in the year 1664, granted unto his brother, the duke of York, the land, soil, seas, bays, rivers, with divers franchises, royalties, and government of New Jersey; that the duke of York granted the same, in like words and powers, to Lord Berkley and Sir George Carteret; that these, by grant, conveyed to the Earl of Perth, William Penn, and others, that part of New Jersey called East Jersey, and to Edward Billinge, that part called West Jersey, together with all the royalties, franchises, and government, as fully as they were granted by the king to the duke of York; and that the present proprietors of East Jersey, deriving their respective titles to their several shares or proportions to all the unlocated soil and waters of East Jersey, by virtue of several mesne conveyances from the original proprietors, had a legal power to dispose of rights to the plaintiff to locate them on this oyster-bed, whereon the trespass is alleged to have been committed. And it is insisted, that as Charles II. did grant, so he had the power to grant, not only the whole soil of a newly discovered, or conquered, country, but certain parts of his royal prerogative, as named in the grants or letters patent to and from the duke of York.

In support of these positions, they cite numerous authorities. *Vattel* 120–5–7, *sec.* 266, and 101, *sec.* 210; 2 *Black.*

Arnold *v.* Mundy.

*Com.* 15; 1 *Ib.* 264, 286; *Davies* 152; 6 *Com. Dig. Navigation D* 50, 60, title *Prerogative;* 4 *Bur.* 2163–4–5; 3 *Cruise, sec.* 14, title *Deed,* 565–8; 17 *John.* 209–10–13; 3 *Term. Reports* 253; 2 *Bin.* 475; 4 *Mass. Rep.* 140; *Har. & M'Hen. Rep.* 564; *Har. L. T.* 5, 7, 10, 11, 14, 17, 19; 1 *Rutherf.* 91; 2 *Ib.* 82; 3 *Chit. Crim. Law* 359; 2 *Ld. Ray.* 1274; 2 *Salk.* 666; *Smith's Hist. N. J., Leaming & Spicer, Grants and Concessions.*

From these authorities it abundantly appears, that by the law of nations and of England, a conqueror has a right to impose such laws on the conquered, as he may think proper; that in England, all property, real and personal, capable of ownership vests in some one or more individuals or bodies corporate; that the titles to lands in England are said to be held, in general, mediately from the king; that certain rights and powers are vested in him, as the head of the government, under the name or title of prerogative, amongst which may be numbered, on the present occasion, the sovereignty of the sea to a certain extent, and of all public rivers, royal fish, as whales and sturgeons, wrecks, treasure-trove, &c.; that the kings of England have, from time to time, frequently alienated part of the domains belonging to the crown, and bestowed many franchises on their favorites, and rewarded individuals, for their faithful services, with parts of their lands, or granted them many exclusive privileges, as a right to fish in arms of the sea, or public rivers wherein the sea ebbs and flows; and lastly, that King Charles II. did, in the year 1664, grant to the duke of York all the lands, islands, soils, rivers, harbors, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawkings, huntings, fowlings, and all other royalties in, belonging, or appertaining to the state of New Jersey, as well as the government of the same (saving and reserving to the crown the receiving, hearing and determining appeals in and touching any judgment or sentence to be there made or given); to appoint governors, and to make

all necessary laws, &c., so always that they be not contrary to the laws and statutes of England, but as near as may be agreeable thereto.

After a careful examination of the authorities cited to establish the plaintiff's claim to these oysters, and his right to a several fishery on the bed whereon they were laid, I shall proceed to examine the correctness of the inferences and conclusions his counsel have drawn from those authorities. And it may not be amiss to take a very brief view here of the manner in which this country was first settled by English subjects.

In the preface of *Grants and Concessions* by *Leaming & Spicer*, they say : " The great success of the house of Austria on this side the Atlantic, and the prodigious wealth they had drawn from their colonies, could not fail pointing out to so enterprising a people as the Britons, this as a seat of future wealth and grandeur. But the authority of a limited government, aided by the example of a few individuals, would have scarcely been sufficient to prevail on the common people to shake off that attachment inherent in all to their native soil, and dare an untrod ocean in search of a country they had only heard of. It was, therefore, necessary to cultivate such a spirit as should ripen them for the undertaking ; in order to which, King Charles II., in 1668, granted to the duke of York the soil and government of New Jersey, who afterwards transferred the same to other proprietors, who wisely secured to the adventurers their religion, liberties, and property, by which New Jersey was, with great rapidity, transformed from a savage wilderness to a christian and civilized country."

These *Grants and Concessions*, as well as *Smith's Hist. of N. J.*, contain many provisions, agreements, and descriptions of the country, and invitations to settlers from England. In the 17th section of what is called their great charter (*Leaming & Spicer* 395) they, the proprietors, declare that *none* shall be deprived or condemned of life, liberty, or estate, or

Arnold *v.* Mundy.

any way hurt in his or their privileges, freedoms, or fran-
chises, without a trial by jury.   So, in page 12, they secure to
the settlers all such freedoms and privileges within the said
province as to his majesty's subjects do of right belong.   In
page 28, the proprietors instruct their governor to especi-
ally provide for the interest, liberty, and defence of all who
shall plant or inhabit the said province.   In page 54, the
proprietors set forth their claim to all strays of beasts at
land, and all wrecks at sea.   In page 141, in the year 1682,
the duke of York confirms to the twenty-four proprietors,
their heirs and assigns, as well for the planting, peopling,
and improving the lands, territories, &c., all islands, bays,
rivers, &c., repeating all things named in the original grant,
with all his interest, claim, and demand in law or equity ;
and then goes on to say, (page 148) as also *the free use of all
bays, rivers, and waters* leading into, or lying between the
said premises (of East Jersey) *for navigation, free trade,
fishing, or otherways.*

This confirmation became necessary to establish the rights
of the proprietors, for two reasons :   1.   The Dutch had
claimed a right to this country, and had for a number of
years possession of New York and parts adjacent in this state,
and, also, had made settlements on both sides of the Dela-
ware.   They were dispossessed thereof in 1668, by the
English, under Colonel Nichols.   At the expiration of the
war that followed soon after between England and the states
of Holland, they were silent as to their pretensions to this
country.   2.   Although it might be true, that Charles II.
might delegate the powers of government to an individual,
and endow him with many royal franchises, it was strongly
contended that the duke of York had no such power ; and
more especially, it could not pass from proprietor to pro-
prietor, in the manner this state had been conveyed.   These
objections were laid before the king ; the proprietors were
made acquainted with those difficulties, which occasioned
them to say (*Leaming & Spicer, sec.* 613), "Her majesty

hath been advised that we have no right, nor can legally execute any of the said powers, but that it belongs to her majesty, in right of her crown, to constitute governors, &c.; and, being desirous to submit ourselves to her majesty, are willing to surrender all our pretences," &c.

For a more full description of the powers of a conqueror over the conquered, Vattel, Dyer and Vaughan may be consulted. In *Dyer* 166, 224, and in *Vaughan* 281, it is laid down, " If a king of England makes a new conquest of any country, the persons there born are his subjects, for by saving the lives of .the people he gains a property in them, and may impose on them what law he pleases. But until such laws are given, the laws and customs of the conquered country shall hold place, unless contrary to our religion, or *malum in se,* or are silent. In all such cases, the law of the conquering country shall prevail." In 2 *Salk.* 412,· where the laws of the conquered are rejected or silent, they shall be governed according to the rules of natural justice. In *Ib.* 166, 411–12, and in 2 *Willes* 7, if there be an uninhabited country found out by British subjects, as the law is their birthright wherever they go, they carry their laws with them, they are therefore governed by the laws of England.

It is true, that in 1 *Black. Com.* 108, it is laid down, " That the common law of England, *as such,* does not extend to the American plantations." In this he is contradicted by the authorities above stated, and a number of others of great celebrity ; by the universal understanding of all the English emigrating to this country ; by the legislature of our own and several of the neighboring states; and, indeed, it appears directly opposed to his declarations in another part of the same page, where he says, " If an uninhabited country is planted by British subjects, all the English laws applicable to their situation are immediately there in force." What reason can be given why a people, with the approbation of their king, sent to colonize a *ceded* or *conquered*

country for the benefit and aggrandizement of the mother country, should be deprived of their *birthright?* why more than if they went without the king's consent to colonize an *uninhabited* country from discontent at home, from whim, caprice or the advancement of their individual interests? In conquered, or ceded countries, (which our American plantations principally are) " that have laws of their own, the king may, indeed, alter or change those laws, until which the ancient laws of the country prevail, unless such as are against the law of God, as in an infidel country. They, the American plantations, were obtained either by conquest, as driving out the natives, or by treaties." 1 *Black Com.* 108. This will not apply to New Jersey; it was never ceded, by name or description, to England, nor did we drive out the natives, but by a peacable purchase became possessed of their rights to the soil, &c.; and that the proprietors governors, and settlers were all united in the opinion, that the common law and the laws of England were their birthright, is manifest from what has been before stated, as well as from other parts of *Leaming & Spicer, Smith's Hist. N. J.,* our own constitution, and decisions of our highest courts of judicature. In the year 1680, the proprietors, protesting against a duty exacted of them by the duke of York, say, (*Smith's Hist. N. J.* 118) " If we would not assure people of an easy, free, and safe government, an uninterrupted liberty of conscience; and an inviolable possession of their civil rights and freedoms, a mere wilderness would be no encouragement." *Ib.* 118—" To say, that this is a conquered country, and the king, as conqueror, has the power to make laws, raise money, &c. But suppose the king were an absolute conqueror, doth his power extend over his own English people as over the conquered? are not they some of the letters that make up the word conqueror? did Alexander conquer alone, or Cæsar beat by himself? shall their armies of countrymen and natives lie at the same mercy as the vanquished? The Norman duke used not the companions of his victory so ill;

natural right and human prudence oppose such doctrine all the world over." *Ib.* 120, our case is better yet, for the king's grant to the duke is plainly restrictive to the laws and government of England. There are home-born rights declared to be law by statutes, as in the great charter 29 and 34 Edward III. chap. 2. We humbly say we have not lost " any ·part of our liberty by leaving our country, for we leave not our king or government by quitting our soil. Under favor, we buy nothing of the duke if not the right of free colonization as *Englishmen* with no diminution, but expectation of some increase, of those freedoms and privileges enjoyed in our country. The soil is none of his; it is the natives' by the *jus gentium,* the law of nations. It would be an ill argument to convert to christianity, to expel, instead of purchasing them out of those countries." *Ib.* 190—Governor Coxe, the greatest proprietor of West Jersey, appointed in 1687, writes thus, " I do, in my heart, highly approve of the ratified fundamentals, &c., that no person shall be deprived of life, limb, estate, privilege, freedom, franchises, without a due trial &c., as well as all other parts of the fundamentals, if it appears there is nothing in them contrary to the laws of England which extend to our colony, by the breach whereof we inevitably expose ourselves to the forfeiture of our charter."· In 1702, Lord Cornbury was appointed governor by Queen Anne. In his address, that year, to the council and assembly, he says, " Her majesty has commanded me to assure you of her protection upon all occasions. Under her auspicious reign, you will enjoy all the liberty and happiness that good subjects can wish for under the best laws in the universe, I mean the laws of England." The legislature, in answer, say, " they are satisfied that the queen will protect them in the full enjoyment of their rights, liberties and properties, and they are happy under the government of the greatest queen and the best of laws," &c. *Ib.* 414—In 1720, Governor Burnet was appointed, and addressed the legislature, he

congratulates them on the accession of George I. "to which," he adds, "you owe the preservation of your laws and liberties."

*Ib.* 560—In 1699, the proprietors of East Jersey, in a memorial to the lords commissioners of trade and plantations, offer to surrender the government to the king, towards which, they say, they enumerate the following particulars:— "*First,* that his majesty would confirm to them the soil and lands." And in the 13th article—"all lands, goods and chattels of felons, &c., treasure-trove, mines and minerals, royal mines, wrecks, royal fish that shall be forfeited, found, or taken within East Jersey, or within the seas adjacent, to remain to the proprietors," &c.

*Ib.* 572—This not succeeding, in 1701, the proprietors of East and West Jersey presented another memorial, the 14th section of which says, "That all such further privileges, franchises and liberties, as upon consideration, shall be found necessary for the good government and prosperity of the said province, and increasing the trade, may be granted to the proprietors." *Leam & Spi.* 681—In 1680, "As we are the representatives of the freeholders of this province, we dare not grant his majesty's patent, though under the great seal of England, to be our rule; for the great charter of England, *alias Magna Charta,* are the only rules of privilege and safety of every free-born Englishman."

Thus our fore-fathers, bringing with them so much of the common law of Great Britain as was applicable to their change of situation, settled New Jersey, claiming, as their birth-right, all the liberties enjoyed in their native land, with the addition of a number of privileges granted them by the proprietors, as an encouragement to them, and as a benefit to both.

As to the right of Charles II. to grant the sea, bays, rivers, fisheries, and other royal franchises in such manner as to now vest, by a string of conveyances from subject to subject, a several fishery in the plaintiff, as contended for by

his counsel. *Dav.* 150, 152; *Bur.* 2164; 3 *Cruise* 170, *Franchise, sec.* 68; *Salk.* 637, and *Esp. Dig. pt. i,* 270, are relied on as supporting that position. In the case of the royal fishery of the river Banne, in Ireland, it was resolved by the court there—" 1. That a man may have a proper and several fishery as well in a *water* or *river* as in a fishery, and, therefore, a *water* may be granted. 2. There are two kinds of rivers, navigable and not navigable. Every navigable river, so far as the sea ebbs and flows, is a royal river, and the fishery of it is a royal fishery, and belongs to the king by his prerogative. But in every other river *not navigable,* and in the fishery of such rivers, the ter-tenants on each side have an interest of common right. The reason for which the king hath an interest in such navigable river, so high as the sea flows and ebbs in it, is because such river participates of the nature of the sea, and is said to be a branch of the sea. The sea is not only under the dominion of the king, but is his proper inheritance, and, therefore, the king shall have *the land which is gained of the sea,* also the grand fishes of the sea, as whales and sturgeons, which are royal fishes, and no subject can have them without the king's special grant, for the king ought of right to save and defend his realm, as well against the sea as against his enemies. The commission of sewers was awarded by the king, by virtue of his prerogative, and extends to not only walls and banks of the sea but also to navigable rivers and fresh waters. In statute 25, Henry VIII. the king, by reason of his prerogative, ought to provide that *navigable* streams be made passable. 3. The city of London, by charter from the king, had the river Thames granted to them. But because it was conceived that the soil and ground of the river did not pass by the grant, they purchased another charter, by which the king granted them *solum et fundum* of the said river, by force of which the city receives rents of those who fix posts or wharves on the soil of said river; and although the king permits people to have passage over such

rivers, he hath the sole interest in the soil, and also in the fishery, although the profit of it is not commonly taken by him if it is not of extraordinary and certain value, as the fishery of the Banne hath at all times been. Wherefore it was resolved, that the river Banne, so far as the sea flows and ebbs in it, is a royal river, and the fishery of salmon *there* is a royal fishery, which belongs to the king as a several fishery, and not to those who have the soil on each side the water. On the other hand, it was agreed, that every inland river *not navigable* appertains to the owners of the soil where it has its course."

3. That no part of this royal fishery of the Banne could pass by the grant of lands adjoining by the general grant of *all fisheries*. This is a fishery in gross, and a parcel of the inheritance of the crown by itself. The case itself also states, that in this river, Banne, there was a rich fishery of salmon, which was parcel of the ancient inheritance of the crown, as appears by the *pipe-rolls* and surveys, where it was found in charge of the officers of the pipe office as a *several fishery*, and was granted to the city of London *in fee farm*. This was intruded on and shared amongst the Irish lords, who took possession by strong hand, and held it a long time. The king granted, by letters patent to Sir Randal M'Donald, a parcel of the county of Antrim, adjoining the river Banne, where the fishery is, together with all waters, fish and fisheries within the said territory. And the question before the court was, whether the grant included any part of this fishery? which was determined in the negative, on the ground, that it was a several fishery belonging to the crown, as a parcel of its ancient inheritance, which was proved by several pipe-rolls and surveys, and was in charge of the officers of the pipe office. It was also let in *fee farm*, the mode by which the lands attached to the crown were generally held by the tenants of the crown. Nor do I see how else it could be called a royal fishery, and salmon *royal fish*, which is in the same book, as well as in many others,

confined to whales and sturgeons. The same book, 111–12, in another case of tanistry, says, "the king, as conqueror of Ireland, has possession of all lands which he willeth to seize and retain in his own hands, for his profit or pleasure. And where the natives of a conquered country are received under the protection of the conqueror, and are permitted to retain their possessions, their heirs shall be adjudged in a good title, without grant or confirmation, according to the rules of law there established." Salkeld, Espinasse, and other authorities, cite the case from Davies of the river Banne, as supporting the doctrine they hold.

2 *Cruise* 278—" A franchise is a branch of the royal prerogative, subsisting in the hands of a subject by grant from the king, annexed to manors and the right to hold courts leet, to have waifs, wrecks, royal fish, which consist of whales and sturgeons." So in *Ib.* 297—" A free fishery, or exclusive right of fishing in a public river, is a royal franchise, which is now frequently vested in private persons, either by grant from the crown or by prescription." But he adds—" This right was probably first claimed by the crown upon the establishment of the Normans, and was deemed by the people a usurpation."

In 4 *Bur.* 2162, it was declared as the opinion of the whole court, that one might prescribe for a several fishery, *parcel of a manor*, where the sea flows and reflows, but he must prove a right by prescription, the presumption is against him. In navigable rivers, where the sea flows and reflows, the right of fishing is common. And Lord Mansfield adds—" The rule of law is uniform, in rivers not navigable, the proprietors of the land have the right of fishery on their respective sides; but in navigable rivers they have it not, the fishery is common."

In 1 and 2 *Modern*, Lord Hale says—" In case of private rivers, the lords having the soil is good evidence to prove he hath the right of fishing, and it puts the proof on them who claim *liberam piscariam*. But in case of a river that flows

and reflows *prima facie* it is common to all. If any claim it to himself, the proof lieth on his side ; and it is a good justification to say, the *locus in quo* is a branch of the sea, and that the subjects of the king are entitled to a free fishery. The soil of the Severn, with particular restraint, as gurgites, is in the lords, and a special kind of fishing, but the common kind of fishing is common to all. The soil of the Thames is in the king ; the Lord Mayor is conservator of the river, and it is common to all fishermen ; therefore there is no such contradiction betwixt the soil being in one, and yet the river being common to all fishers."

5 and 6 *Comyns, titles Navigation* and *Prescription.* These authorities, and others relied on by the plaintiff, cite the ancient authority of Davies and the river Banne in support of the doctrines they establish.

On the part of the defendant, has been cited 1 *Salkeld* 357. Lord Holt says, " the subject has a right to fish in all navigable rivers as he has in the sea." 6 *Mod.* 73— " Every subject of common right may fish with lawful nets in the navigable rivers, *and the king's grant cannot bar them thereof.* The crown only has a right to royal fish, and that only, the king may grant." In *Lord Ray.* 725—"The public are, at common law, entitled to towing paths on the banks of navigable rivers." 2 *Black.* 39—" A free fishery, or exclusive right of fishing in a public river, is a royal franchise, and is considered as such in all countries where the feudal polity has prevailed ; though the making such grant, and by that means appropriating what it seems unnatural to restrain, the use of running water was prohibited for the future by king John's great charter, so that a franchise of free fishery ought now to be, at least, as old as the reign of Henry II." In 4 *Black.* 423–4—" King John, and afterwards his son Henry III. consented to the two famous charters of English liberties, *Magna Charta* and *charta de foresta,* by which care was taken to protect the subject against oppression, and every individual of the nation in

the free enjoyment of his life, his liberty, and his property, prohibited for the future the grants of exclusive fisheries, and the erection of new bridges oppressive to the neighborhood." The same doctrine is recognized in Espinasse, in Jacob's L. D. and other writers on this subject.

5 *Bac. Abr.* 494, *title Prerogative*—" The king's prerogative is part of the law of England, and is a word of large extent, including all the rights and privileges which by law the king hath as head of the commonwealth, entrusted with the execution of the laws; for as they maintain his safety, power, and dignity, so they likewise declare the rights and liberties of the subject. Hence it is an established rule, that all prerogatives must be for the advancement and good of the people, otherwise they should not be allowed by law. The sovereignty is in the parliament, of which the king is only a part; but, as executive magistrate, he is clothed with great powers, all intended for the good of the people, none to their detriment, nor can any prerogative be *legally* so employed. And it is to answer the ends of government, and for the good of the people by a *fiction of law* he is considered the universal occupant of all lands; not that the people held their lands by any actual royal grant." *Ib.* 156–7— " So the king has sovereign dominion in all seas and great rivers, and a right to the fisheries and to the soil, so that if a river, so far as there is a flux of the sea, *leaves its channel it belongs to the king*, who protects his subjects from pirates, and provides for the security of trade and navigation. But notwithstanding the king's prerogative in seas and navigable rivers, yet it hath been *always* held, that a subject may fish in the sea, which being a matter of common right, and the means of livelihood, and for the good of the commonwealth, cannot be restrained by grant or prescription. Also, of common right, with lawful nets in navigable rivers, as well as in the sea, and the king's grant cannot bar them thereof, except royal whales and sturgeons, in which he has a right as a perpetual sign of his dominion, and which only he may grant."

*Ib.* 205—"It seems clearly agreed, that the king may alien, grant, or change any branch of his revenue in which he has an estate of inheritance, as also his lands in fee simple, though seized of them as *jure coronæ*. This power is founded on reasons of state, as he cannot raise money on the subject without an act of parliament. If he had not the power of aliening his lands, the kingdom might suffer from sudden invasion," &c.

4 *Comyns, Grant E*—"By the grant of a piscary, the soil or water does not pass. By a grant of water, the soil does not pass. The king, by his grant, cannot alter the law in any respect, nor dispense with things in which the subject hath an interest, or change the common law by charter or *Magna Charta*, which is incorporated into the common law." 6 *Comyns, title Prerogative D* 7; *Ib. D* 49— "Every navigable river, as high as the sea flows, belongs to the king, but every one may fish in the sea of common right."

On comparing all the above authorities, and the reasons on which they are founded, we are compelled to acknowledge, that although the kings of England formerly may have lavished on favorites, or rewarded the service of individuals with many franchises entrusted to them for the public benefit, yet the people ever considered it as a violation of good faith, an unlawful infringement of their common rights, and as destructive alike to their liberties and their interest; until the evil increasing beyond endurance, they, sword in hand, forced from their kings the most solemn and public declaration of their rights in *Magna Charta*.

1 *Black. Com.* 128—"The absolute rights of every Englishman, as they are founded on nature and reason, so they are coeval with our form of government. At some times we have seen them oppressed by overbearing and tyrannical princes; at others, so luxuriant as even to tend to anarchy. But the vigor of our free constitution has always delivered

the nation, and the balance of our rights and liberties has settled to its proper level, and their fundamental articles asserted in parliament : first, by the great charter of our liberties obtained from king John ; afterwards, its confirmation," &c.

If we add to all these the conduct pursued by the proprietors themselves in the first settlement of New Jersey, by favorable and public descriptions of the country, and by letters to individuals to induce their fellow subjects to settle here, we shall be more and more convinced that the claim of the plaintiff to the exclusive right of this fishery is without legal foundation.    In *Smith's History of New Jersey* we find the proprietors, in 1683, sent over Thomas Rudyard as their deputy governor of East Jersey.    In May, the same year, he writes from thence, page 168—" We have one thing more particular here, which is vast oyster-banks, which is constant fresh victuals during the winter to English as well as Indians ; of these there are many all along our coasts, from the sea as high as against New York, where they come and fetch them."    *Ib.* 170—" Upon our view and survey of Amboy point, we find it extraordinary well situate for a great town.    At low water mark, round about the point, are oysters of two kinds, some as small as English, and others two or three mouthfuls, exceeding good.    We have store of clams, esteemed much better, than oysters, and fish we have a very great store.    Sea-nets are good merchandise here."

S. Groom, another proprietor, and surveyor-general, writes from Amboy, 1781, page 174—" The Indians come thither to get fish, fowl, oysters, clams, &c., as people go to market."

Gawen Lawrie, a deputy governor for East Jersey, writes from Elizabeth Town, and, in page 177, says—" Pork and beef at two pence per pound ; fish and fowl plenty ; oysters, I think, would serve all England."    Again, in page 180— " There is a great plenty of oysters, fish, and fowl."

Arnold *v*, Mundy.

In page 187, three of the proprietors give a particular description of East Jersey, and say—"There are no fishermen that follow only that trade, save some that go a whaling upon the coast; and for other fish, there is abundance to be had everywhere through the country, in all rivers, and the people, with sieves, catch one or two barrels a day for their own use and to sell to others."

In page 541, the proprietors describe the country, and invite settlers thus:—"It is likewise proper for such who are inclined to fishing, the whole coast and very harbors' mouths being fit for it, which has been no small rise to the New England people, and may be carried on with great advantage, The Indians catch fish, and sell at a less price than the value of time an Englishman must spend in taking them."

As early as 1718, (*Nevill's Laws* 86) is found "An act for the preservation of oysters:—Sec. 1. Whereas it is found that the oyster-beds within this province are wasted and destroyed, the preservation of which will tend to the great benefit of the poor people and others inhabiting this province, *all persons* are prohibited from raking or gathering oysters from off any beds in this province from the 10th of May to the 10th of September; and that no person, at any time, should carry them away in any boat or vessel not wholly owned by a person living within the province."

And in this way others wrote to their friends, and in no part of the many public or private communications of the proprietors or inhabitants do we see even a hint that the navigable rivers of New Jersey were considered in any other point of view than, to use their own words, "inlets which God and nature formed" as the highway to the country, or the fisheries as anything more than as the rich provision of the same bountiful Creator for the common use and benefit of the settlers. The proprietors were men who understood their rights, and were fearless in the defence of them. If those who twice purchased New Jersey; who

braved the dangers of an immense ocean ; shared in the
toils, sufferings, and privations of the first settlers ; who-
claimed all strays by land, and wrecks by sea, in virtue of
their grants, and never for a moment conceived that these
grants swallowed up what, by the law of the land they left,
had ever been considered the common rights of Englishmen :
shall we, after a lapse of almost three centuries, insult the
memory of the men who were an ornament to the human race,
whose virtues have highly exalted their names, and whose
labors have been a blessing to the world, by saying they knew
nothing of their privileges, and that their birthrights were
lost forever in the forests of New Jersey ; that their boasted
*Magna Charta* was a farce from which they could derive no-
benefit; and that liberty, which they so highly valued, was
confined to the grants and concessions? or that our legisla-
tures from time to time taking upon them to regulate fisheries
of oysters as well as of floating fish for the public benefit,
were totally ignorant of their powers, overstepped the
bounds prescribed by the constitution to the destruction of
the rights and interests of individuals ? I think not. The
foregoing facts speaks strong language, and impress the mind
more forcibly than volumes of abstruse and theoretical rea-
soning; and, on a careful examination of the whole subject,
I am of opinion, that the plaintiff had no such property in
the oyster-bed in question by laying a proprietary thereon,
as to give him an *exclusive* right to the oyster fishery there.

On the second point. I think that question has been
decided by this court in the case of *Shepard & Layton,* v.
*Leverson* (1 *Pen.* 391), and although I differed from my
brethren in their view and determination of that case,
respect for their opinions prevents a wish, on my part, to
shake that determination. The Chief Justice there says—
" That in a common fishery, no man can appropriate to him-
self any particular shoal, bed or spot, to the exclusion of
others. That the planting these oysters was returning them
to their proper element to mix with their kind, and was, in
contemplation of law, a complete abandonment."

Arnold *v.* Mundy.

Justice Pennington says—" It is admitted, that the plaintiff planted a quantity of oysters in a public navigable river, or highway, where the tide ebbed and flowed, and in which fish and oysters were taken, as of right; that there were no oysters to be found at that particular spot at the time of planting. Now although there may not have been any oysters on the particular spot where the oysters were put down, at the time of doing it, yet there may have grown oysters there since, in which case he would not be entitled to all the oysters found in the same bed. This case would resemble 'the case of a stranger voluntarily throwing his grain or money into my heap, when, from the difficulty of separation, caused by his own folly, I would be entitled to the whole."

But the present case does not present as fair a claim to the verdict of a jury, or the judgment of a court, as the one from Monmouth. There it was admitted, that the oysters were placed on a part of the bed of the river where no oysters grew. Here they were confessedly placed on an old and frequented oyster-bed. If returning oysters into their natural element, the river, even if no oysters grew in that particular spot, and the mere possibility of a future increase, was such an abandonment of the right of ownership as to justify the taking them, in the opinion of the court, surely there can be no pretence for saying, that placing them in that element where oysters had grown for ages, was not, in contemplation of law, a complete abandonment of the plaintiff's right. On much consideration of this case, I am of the opinion, that the plaintiff should take nothing by his motion.

Therefore, let the rule to shew cause be discharged.

His honor, Judge FORD had made up an opinion concurring with his brethren, but did not deliver it at large.